NORTH BUCKHEAD CIVIC ASSOCIATION, a Nonprofit Community Benefit Unincorporated Association; James F. Appleby, and J. Ralph Compton, Plaintiffs–Appellants,

v.

Samuel K. SKINNER, as Secretary of the United States Department of Transportation; Robert E. Farris, as Administrator of the Federal Highway Administration; Leon N. Lawson, as Regional Administrator of the Federal Highway Administration; and Louis M. Papet, as Division Administrator of The Federal Highway Administration; Hal Rives, Commissioner of the Georgia Department of Transportation, and Their Successors In Office; The United States of America; and The Georgia Department of Transportation, Defendants–Appellees,

Metropolitan Atlanta Rapid Transit Authority ("MARTA"), Defendant–Intervenor–Appellee.

No. 89-8633.

United States Court of Appeals, Eleventh Circuit.

June 26, 1990.

David F. Walbert, Walbert & Hermann, Atlanta, Ga., for plaintiffs-appellants.

Daniel A. Caldwell, III and Roland Floyd Matson, Atlanta, Ga., for defendants-appellees.

John Roger Lowery, Pursley, Howell, Lowery & Meeks, Atlanta, Ga., for MARTA.

Before COX, Circuit Judge, RONEY * and SMITH **, Senior Circuit Judges.

EDWARD S. SMITH, Senior Circuit Judge.

The North Buckhead Civic Association, *et al.*, appeal the June 13, 1989, Order of the United States District Court for the Northern District of Georgia denying their motions to enjoin construction of the Georgia 400 Extension, a proposed multi-lane highway with a median designed to accomodate heavy rail mass transit. Appellants oppose the highway but support the mass transit element, and contend that the district court erred in finding that the appellees complied with the requirements of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 *et seq..* Specifically, appellants assert that the Environmental Impact Statement (EIS) for the project is inadequate for the following reasons: (1) all alternatives were not properly considered in the preparation of the EIS, (2) the administrative record does not support the traffic projections and environmental impact studies contained in the EIS, and (3) the Urban Mass Transit Administration

* *See* Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

** Honorable Edward S. Smith, Senior U.S. Circuit Judge for the Federal Circuit, sitting by designation.

was improperly excluded during the development of the EIS. We *affirm* the district court's denial of the motion for an injunction.

## I. *Facts and Historical Background*

The Federal–Aid Highway Act[1] and the Urban Mass Transportation Act[2] set forth guidelines for the planning and development of urban highway and mass transit systems. Under these sections, the Secretary of Transportation cannot approve any state or local transportation improvement project for federal funding unless he finds "... such projects are based upon a continuing and comprehensive transportation planning process carried on cooperatively by States and local communities...."[3] The local concerns must develop transportation improvement plans which consider social, economic, environmental, and energy conservation goals; the probable effect on land use and future development must also be included in any proposal.[4]

In order to implement these provisions, the Federal Highway Administration (FHWA) and the Urban Mass Transit Administration (UMTA) have promulgated unified regulations with which state and local planners must comply to secure federal aid for transportation projects.[5] Initially, the Governor of the State must designate a Metropolitan Planning Organization (MPO) as a planning agency and federal grant recipient for each urban area.[6] The MPO for the Atlanta area is the Atlanta Regional Commission (ARC). The members of ARC include local government officials such as the Mayor of Atlanta and the members of the Boards of Commissioners of each metropolitan Atlanta county. A staff of technical and policy committees report to the ARC members, who are responsible for comprehensive transportation planning in the Atlanta metropolitan region.

The ARC strategy included three plans, each with increasing specificity: (1) a prospectus and multiyear urban planning work program (RDP);[7] (2) a regional transportation plan (RTP) including both long and short term elements;[8] and (3) an annually updated transportation improvement program (TIP) developed in cooperation with state and local officials.[9]

The FHWA and UMTA will approve urban transportation projects for federal funding only if the projects have been drawn from the TIP and only if the process used in identifying them has been properly certified.[10] Certification, however, only preserves eligibility for federal funding. The federal agencies are not thereby committed to funding the proposed project; likewise, the state and local governments may opt to fund particular projects with non-federal money.[11] The federal government exercises no control over the substantive aspects of the systems planning process, but is concerned only with whether the planning *process* complies with Part 450 of the unified regulations.[12]

The need for improved transportation service within the North Atlanta Corridor has been recognized by planning agencies, transportation agencies, public officials and private citizens for over three decades.[13] These needs range from the immediate,

---

1. 23 U.S.C. §§ 101–156.

2. 49 U.S.C.App. §§ 1601–1618.

3. 23 U.S.C. § 134, 49 U.S.C.App. § 1607.

4. 23 U.S.C. § 134.

5. *See* 23 C.F.R. Part 450; 49 C.F.R. Part 613; *Atlanta Coalition on the Transp. Crisis, Inc. v. Atlanta Regional Comm'n,* 599 F.2d 1333, 1338 (5th Cir.1979).

6. 23 C.F.R. § 450.106 (1989).

7. 23 C.F.R. § 450.114.

8. 23 C.F.R. § 450.116.

9. 23 C.F.R. § 450.118.

10. *See* 23 C.F.R. § 450.122. Certification involves an annual joint review by the agencies to determine if a proposed project "meets or substantially meets" the requirements of Part 450. 23 C.F.R. § 450.122(b).

11. *Atlanta Coalition,* 599 F.2d at 1340.

12. *Id.*

13. FEIS, vol. I at 45.

localized need for improved peak hour operating conditions to the long range provision of planned, orderly development for the metropolitan Atlanta region.[14] The extremely heavy traffic demand in the area has overburdened the surface street network, congesting major intersections and resulting in unstable traffic patterns. Early Regional Development Plans noted the inadequacy of the street system in the North Atlanta Corridor and called for the development of a multi-lane limited access highway from I–85 south of Lenox Road north to the interchange of I–285 and Georgia 400. The RDP also called for the development of an exclusive two lane busway in conjunction with the highway project. The RTP approved in August 1977 included the roadway as a long range project.

The proposed project was briefly suspended for several years to allow for completion of other highway construction in the Atlanta area, but in 1981 the North Atlanta Corridor Transportation Study (NACTS) was undertaken by the ARC staff. The NACTS was conducted within the regular transportation planning framework for the Atlanta region, with participation by all jurisdictions, agencies, and the public. The project examined various transportation alternatives which purported to solve the traffic congestion problems in the North Metropolitan area. The study recommended that a multi-lane limited access highway joining I–285 and I–85 (North Atlanta Parkway) be constructed to (1) relieve traffic congestion and reduce accidents on local streets; (2) improve access to major traffic generators and local businesses; and (3) maximize transit efficiency to encourage balanced travel. As a result of the NACTS, the ARC Board amended the RTP in 1983 to include the North Atlanta Parkway.

In June 1984, the ARC advanced the Parkway and other transportation improvements to the TIP to allow for federal funding. The RTP was finally amended in March 1985 to increase the total number of lanes in the Parkway to six and to allow for the inclusion of a MARTA rail line in the Parkway median. Before the Federal Highway Administration (FHWA) would make federal funds available, however, an Environmental Impact Statement (EIS) which conformed to the requirements of NEPA had to be prepared. The EIS, which contained information concerning the social and economic impacts as well as the physical impacts of the proposed project, was prepared by the applicant, the Georgia Department of Transportation (GDOT), with review by the FHWA.

The preparation of the EIS is essentially a cooperative effort with a number of various agencies contributing in an area of particular expertise. Preparation began in the summer of 1984 when the GDOT initiated the scoping process. During this process, federal, state and local agencies and the general public met to identify issues which might possibly arise. Then, before a draft of the EIS was written, studies were conducted, analyses done, pertinent data accumulated, and alternative means of attaining the established project goals were considered. The draft EIS, after review by the FHWA and the Office of Environmental Policy, was circulated among other federal and state agencies and released to the public in October 1986. Comments on both substance and presentation were solicited. The final EIS contained these comments and a response. In August 1987, the Environmental Programs Manager for FHWA signed the final EIS, having concluded that proper procedures had been followed in its preparation and that the concerns of the public had been appropriately addressed. He signed only after receiving the concurrence of the Office of Environmental Policy and the Office of Secretary of Transportation. The EIS in its final form was, then, made available to the public, the Environmental Protection Agency and other governmental agencies; additional comments were also accepted. The last step, the signing of the Record of Decision by FHWA's Environmental Programs Manager, was taken in October 1987.

The alternative recommended in the EIS was the North Atlanta Parkway (Georgia

14. *Id.*

400 Extension), a proposed 6.25 mile limited access, six-lane tollway that will connect Interstate I–85 and Interstate I–285 in Northeast Atlanta. The proposed tollway included a transit median for possible inclusion of a MARTA rail line as well a new connecting road system (Buckhead Loop and Glenridge/Perimeter Connector).

In December 1988, North Buckhead Civic Association, a neighborhood organization whose members live in the project area and two individuals whose property will be affected by the highway construction, filed an action for declaratory and injunctive relief under The National Environmental Policy Act challenging the sufficiency of the EIS. After a four-day evidentiary hearing, the district court found that the EIS met the requirements as set out in NEPA and dismissed the complaint. Plaintiffs appeal.

## II. *Standard of Review*

The district court, after reviewing the lengthy, complex administrative record, concluded that the agencies' actions were not "outside their authority or outside the requirements of the law." [15] Our legal duty is to review the district court's conclusion, but at the outset we must decide what standard to apply in this review process.

■ The issue first involves the question of what standard reviewing courts should apply to the *agency's* decisions. Appel-

lants assert that a "rule of reason" is appropriate, which presumably means that the reviewing court must make its own determination of reasonableness to ascertain whether the agency action complied with the law. The "reasonableness" standard of review has been used by several circuits, including the Eleventh Circuit. [16] The appellees counter that the reviewing court need only decide whether the agency decision was "arbitrary and capricious".

In *Marsh v. Oregon Natural Resources Council,* [17] the Supreme Court considered the question of judicial review under NEPA and explicitly rejected the reasonableness standard. [18] The Court adopted instead the arbitrary and capricious standard as set forth in § 706(2)(A) of the Administrative Procedure Act. [19] We, therefore, adopt the arbitrary and capricious standard when reviewing agency action in NEPA cases; if the agency action was not arbitrary or capricious, it should not be set aside. [20]

■ To determine whether an agency decision was arbitrary and capricious, the reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." [21] This inquiry must be "searching and careful," but "the ultimate standard of review is a narrow one." [22] Along the standard of review continuum, the arbitrary and capricious standard gives an appellate court the least latitude in finding grounds for rever-

**15.** *North Buckhead Civic Assn. v. Skinner,* No. 88–2744, at 42 (N.D.Ga. June 13, 1989) (order denying motion for injunction).

**16.** *Manasota–88, Inc. v. Thomas,* 799 F.2d 687, 691–92 (11th Cir.1986); *National Wildlife Fed'n v. Marsh,* 721 F.2d 767, 782 (11th Cir.1983); *see also Northern Plains Resource Council v. Lujan,* 874 F.2d 661, 665 (9th Cir.1989); *Sierra Club v. Froehlke,* 816 F.2d 205, 210 (5th Cir.1987); *Sierra Club v. Marsh,* 769 F.2d 868, 871 (1st Cir. 1985); *Monarch Chem. Works v. Thone,* 604 F.2d 1083, 1087–88 (8th Cir.1979).

**17.** —— U.S. ——, 109 S.Ct. 1851, 1860–61, 104 L.Ed.2d 377 (1989).

**18.** 109 S.Ct. at 1861, n. 23.

**19.** 5 U.S.C. § 706(2) provides in pertinent part that a reviewing court shall: "hold unlawful and set aside agency action, findings, and conclu-

sions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; ..."

**20.** We also agree with the Court's conclusion in *Marsh* that the difference between the two standards is "not of great pragmatic consequence", 109 S.Ct. at 1861, n. 23. The differences between the two standards may be "difficult to discern." *Manasota–88, Inc. v. Thomas,* 799 F.2d 687, 692, n. 8 (11th Cir.1986). As is so often the case, there does not appear to be a tincture of difference in the conclusion to be reached in the present case if we apply either of the advocated standards of review.

**21.** *Marsh,* 109 S.Ct. at 1861, *citing Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

**22.** *Id.*

sal;[23] "[a]dministrative decisions should be set aside in this context ... only for substantial procedural or substantive reasons as mandated by statute, ... not simply because the court is unhappy with the result reached."[24] The agency must use its best judgment in balancing the substantive issues.[25] The reviewing court is not authorized to substitute its judgment for that of the agency concerning the wisdom or prudence of the proposed action.[26]

■ Appellant, relying on *Sierra Club v. United States Army Corps of Engineers*,[27] further maintains that "because of the conflict in views" among commenting agencies, the findings and actions recorded in the administrative record should be accorded little or no deference. We disagree. In *Sierra Club* the preparer of the final EIS apparently ignored and failed to respond to the conflicting views of other commenting agencies having relevant expertise; therefore, the district court concluded that the environmental impact of the proposed project was not considered sufficiently. The district court made no such finding in the case *sub judice*. The court found that the lead agency made a reasoned decision based on its evaluation of the significance—or lack of significance—of the information submitted by the commenting agencies. "When specialists express contrary views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."[28]

■ Next, we must determine the standard that an appellate court should apply to the district court's decision upholding the agency. In the present case, the district court conducted a four-day evidentiary hearing in which witnesses from the various federal and state agencies involved in the project testified about the preparation of the EIS. Witnesses for the plaintiffs also testified about the anticipated effects that the proposed project would have on the North Atlanta community. Counsel for each party had an opportunity to cross examine witnesses. The district court reached its conclusion on the adequacy of the EIS from the testimony of these knowledgeable witnesses and from submitted documentary evidence. Factual inferences drawn from such sources should not be disregarded on appeal unless clearly erroneous.[29]

A court of appeals review of a district court review of an administrative agency's record is indeed an "awkward legal animal,"[30] but when the district court's judgment turns on factual matters, or upon the testimony of witnesses, or even upon lengthy evidentiary proceedings, the court of appeals should hesitate to reverse.[31] This court will reverse a district court's finding that an EIS is adequate only if the district court's decision is based on an erroneous legal standard or upon clearly erroneous findings of fact.[32]

## III. NEPA

Prior to the passage of the The National Environmental Policy Act (NEPA), environ-

23. *SSIH Equip., S.A. v. United States Int'l Trade Comm'n,* 718 F.2d 365, 383 (Fed.Cir.1983) (additional comments by Nies, J.).

24. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978).

25. *Druid Hills Civic Ass'n v. Federal Highway Admin.,* 772 F.2d 700, 709 (11th Cir.1985), *cert. denied,* ── U.S. ──, 109 S.Ct. 60, 102 L.Ed.2d 38 (1988).

26. *Id.*

27. 701 F.2d 1011, 1030–31 (2nd Cir.1983).

28. *Marsh,* 109 S.Ct. at 1861.

29. *Sierra Club v. Marsh,* 769 F.2d 868, 872 (1st Cir.1985); *citing* Fed.R.Civ.P. 52(a) ("due regard shall be given the opportunity of the trial court to judge the credibility of the witnesses"); *Anderson v. Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985) (clearly erroneous standard applies even when district court factfinding is based on "documentary evidence or inferences from other facts").

30. *Sierra Club v. Marsh,* 769 F.2d at 871–72.

31. *Id.*

32. *Druid Hills,* 772 F.2d at 709, *citing Sierra Club v. Morton,* 510 F.2d at 818. *See also Northern Plains Resource Council v. Lujan,* 874 F.2d 661, 665 (9th Cir.1989).

mental considerations were systematically underrepresented in the federal agency decision making process. Consistent with traditional notions of natural resource allocation, the benefits of development were overstressed and less environmentally damaging alternatives for meeting program objectives were often given limited consideration.[33] NEPA declares a broad national commitment to protecting and promoting environmental quality.[34] This commitment is implemented by focusing government and public attention on the environmental effects of proposed agency action; the Act ensures that important environmental consequences will not be "overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." [35] In short, NEPA requires that the evaluation of a project's environmental consequences take place early in the project's planning process.[36]

NEDA establishes some important "action forcing procedures" designed to compel an agency to commit to the Act's expressed goals of protecting and promoting environmental quality.[37] These procedures require that an agency prepare detailed statements evaluating a proposed project's environmental impact.[38] The requirement that agencies prepare detailed environmental impact statements satisfies the "twin aims" of NEPA: (1) ensuring that agency attention will be focused on the probable environmental consequences of the proposed action and (2) assuring the public that the agency has considered environ-mental concerns in its decision making process.[39] Most importantly, the detailed EIS also serves as a springboard for public comment and incorporates the critical views of other federal, state, and local agencies. The document offers these bodies notice of the program's expected environmental consequences and the opportunity to plan and implement corrective measures in a timely manner.[40]

■ NEPA's statutory scheme does not rely on substantive, results-based standards to insure that environmental concerns will be adequately addressed. The Act's action forcing provisions impose essentially procedural requirements on federal agencies.[41] "Although these procedures are almost certain to affect the agency's substantive decision, it is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process." [42] The adequacy of an EIS depends on whether the agency followed the procedure required by law in its preparation. Courts will require only the statutory minima and will undertake their review with a recognition that Congress did not mandate perfection.[43]

"If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." [44] Congress requires only that the agency take a "hard look" at the environmental consequences before undertaking a

**33.** Tarlock, *Balancing Environmental Considerations and Energy Demands: A Comment on Calvert Cliffs' Coordinating Committee v. AEC,* 47 Ind.L.J. 645 (1972).

**34.** *Robertson v. Methow Valley Citizens Council,* —— U.S. ——, 109 S.Ct. 1835, 1845, 104 L.Ed.2d 351 (1989).

**35.** *Robertson,* 109 S.Ct. at 1845; *Marsh v. Oregon Natural Resources Council,* —— U.S. ——, 109 S.Ct. 1851, 1858, 104 L.Ed.2d 377 (1989).

**36.** *California v. Block,* 690 F.2d 753, 761 (9th Cir.1982).

**37.** *Robertson,* 109 S.Ct. at 1844–45; *See* 42 U.S.C. § 4332(2)(C) (1977).

**38.** *Id.*

**39.** *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 97–98, 103 S.Ct. 2246, 2252–2253, 76 L.Ed.2d 437 (1983); *Robertson,* 109 S.Ct. at 1845.

**40.** *Robertson,* 109 S.Ct. at 1845–46; *See also* 40 C.F.R. § 1503.1 (1987).

**41.** *Vermont Yankee,* 435 U.S. at 558, 98 S.Ct. at 1219.

**42.** *Robertson,* 109 S.Ct. at 1846.

**43.** *Sierra Club v. Morton,* 510 F.2d 813, 820 (5th Cir.1975).

**44.** *Id.*

major action;[45] environmental concerns need not be elevated above all others.[46] Our only role is to insure that the agency has taken a "hard look" at the environmental consequences of the proposed action.[47] "NEPA merely prohibits uninformed—rather than unwise—agency action." [48]

### A. Alternatives

Section 102(2)(C)(iii) of NEPA[49] specifically requires that an EIS contain a detailed statement of alternatives to the proposed action. The regulations which are promulgated by the Council on Environmental Quality (CEQ) to implement NEPA identify the alternative section as "the heart of the EIS".[50] The regulations require that the environmental impacts of the proposal and the alternatives be presented in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public.[51] Consideration of other realistic possibilities forces the agency to consider the environmental effects of a project and to evaluate against the effects of alternatives.[52]

■ Unfortunately, NEPA provides little guidance in determining what alternatives must be considered. The CEQ regulations require only that an agency "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." [53] This procedural requirement is bounded by "some notion of feasibility", and consideration need be given only to reasonable, non-speculative alternatives.[54] Thus, an EIS is satisfactory if the treatment of alternatives, when judged against a "rule of reason", is sufficient to permit a reasoned choice among the various options.[55] The district court, applying a "rule of reason", found the agencies' consideration of alternatives to be adequate. The appellants take issue with this finding, claiming that the EIS failed to give satisfactory treatment to the alternative of a heavy rail transit extension (without a companion multi-lane highway) along the North Atlanta Corridor. Appellants' position is not supported by the record.

### (1) Need and Purpose

■ According to appellants, the agencies defined the "Need and Purpose" of the project in such a way that the highway was conclusively presumed to be required; the no build/heavy rail alternative was then perfunctorily dismissed for its failure to fully satisfy the project objective. This objection to the "Need and Purpose" section of the EIS reflects a fundamental misapprehension of the role of federal and state agencies in the community planning process established by the Federal–Aid Highway Act (FAHA). The FAHA contemplates a relationship of cooperation between federal and local authorities; each governmental entity plays a specific role in the development and execution of a local transportation project. As discussed above, the statutes were not intended to impose requirements on the completed plans but only to regulate the planning process.[56] Likewise, NEPA does not confer the power or responsibility for long range local planning on federal or state

---

**45.** *Baltimore Gas & Electric,* 462 U.S. at 97, 103 S.Ct. at 2252.

**46.** *Stryckers Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980) (per curiam).

**47.** *Druid Hills,* 772 F.2d at 709.

**48.** *Robertson,* 109 S.Ct. at 1846.

**49.** 42 U.S.C. § 4332(2)(C)(iii) (1977).

**50.** 40 C.F.R. § 1502.14 (1989).

**51.** *Id.*

**52.** *Piedmont Heights Civic Club Inc. v. Moreland,* 637 F.2d 430, 436 (5th Cir.1981).

**53.** 40 C.F.R. § 1502.14(a) (1989).

**54.** *Piedmont Heights,* 637 F.2d at 436, *citing Vermont Yankee,* 435 U.S. at 551, 98 S.Ct. at 1215.

**55.** *Druid Hills,* 772 F.2d at 713.

**56.** *See Coalition Against a Raised Expressway v. Dole,* 835 F.2d 803, 809 (11th Cir.1988).

agencies.[57] "An obvious and indeed central aspect of this relationship must be respect for the sovereignty of local authorities."[58]

In the present case, the record is replete with documents indicating that the agencies consulted with and cooperated with local authorities. The district court found that "[t]he transportation demand in the corridor and the goals of the project were developed by the ARC and are set out in the Need and Purpose section of the FEIS ... The Georgia DOT took the goals as developed by ARC and did a feasibility study to try and fulfill them."[59] There is no evidence in the record to indicate that FHWA officials acted arbitrarily in certifying the project. The district court correctly found that federal, state and local officials complied with federally mandated regional planning procedures in developing the need and purpose section of the EIS.

### (2) Alternatives Considered

■ Appellants further assert that the district court erred as a matter of law in holding that the EIS need not consider as a possible alternative a proposal that would only partly fulfill the stated project objective. The two alternatives discussed with greatest detail in the EIS were the preferred alternative, a six-lane tollway with transit median, and the "no build" alternative. Traffic studies cited in the EIS found that while the no build/heavy rail alternative advocated by appellants would provide additional capacity to the overall North Atlanta Corridor transportation system, it would provide little relief for the congestion in the existing street network. The congestion remaining on surface streets after completion of the no build/heavy rail option was determined to be virtually the same throughout the project corridor as for

the no build condition. The traffic studies concluded that "both a highway and a mass transit element were necessary to relieve the congestion in the North Atlanta Corridor; either element standing alone would fail to meet the transportation demand."[60] In short, the no build/heavy rail alternative was eliminated from further detailed consideration because it did not fully meet the transportation needs as set forth in the "Need and Purpose" section of the EIS.[61]

Appellants cite various authorities for the proposition that NEPA requires a full assessment of alternatives that only meet a portion of the stated need and purpose of a project.[62] The district court identified the rationale behind the interpretation of NEPA urged by appellants: a discussion of alternatives that would only partly meet the goals of the project may allow the decision maker to conclude that meeting part of the goal with less environmental impact may be worth the tradeoff with a preferred alternative that has greater environmental impact.[63] This argument is well taken, but appellants have failed to show that such a situation exists in this case. The record is devoid of evidence that the no build/heavy rail alternative will have a less severe overall environmental impact than the preferred alternative. Appellants state that mass transit is generally less environmentally damaging than multi-lane highways, but such policy arguments in favor of mass transit are unconvincing and better reserved for those legislative bodies having responsibility for local planning.[64]

We agree with the district court's conclusion that an alternative partially satisfying the need and purpose of the proposed project may or may not need to be considered depending on whether it can be considered a "reasonable alternative". Un-

---

57. See Isle of Hope Historical Ass'n, Inc. v. United States Army Corps of Eng'rs, 646 F.2d 215, 221 (5th Cir. Unit B May 1981) (per curiam).

58. Id.

59. North Buckhead, No. 88-2744, at 14-15.

60. EIS at page 46.

61. North Buckhead, No, 88-2744, at 25-26.

62. See Natural Resources Defense Council, Inc. v. Callaway, 524 F.2d 79, 93 (2nd Cir.1975); Natural Resources Defense Council v. Morton, 458 F.2d 827, 834-35 (D.C.Cir.1972).

63. North Buckhead, No. 88-2744 at 27 n. 5.

64. South La. Envtl. Council v. Sand, 629 F.2d 1005, 1011 (5th Cir.1980) citing Vermont Yankee, 435 U.S. at 558, 98 S.Ct. at 1219.

der the circumstances here, it was not necessary for the EIS to restate the conclusions of all the experts, or to engage in a rethinking of the regional and city-wide transportation plans. There is no evidence here that heavy rail transit alone is a reasonable alternative to the construction of the Georgia 400 extension in the North Atlanta corridor. While mass transit lines would provide additional transportation capacity in the corridor, the problems of surface street congestion would remain completely unresolved. The administrative record contains a large amount of scientific data that shows the no build/heavy rail alternative was rejected because the existing streets would not be able to accomodate future traffic volumes.[65] The administrative record shows that the FHWA and GDOT took a hard look at the alternatives and that the decision to eliminate the no build/heavy rail alternative from consideration was not arbitrary and capricious. The final EIS that resulted fulfilled its purpose of providing the ultimate decision maker with sufficient environmental information to aid in choosing between the various available alternatives.[66] Although the EIS does not contain what appellants feel is a detailed and careful analysis of the environmental consequences of the proposed action and the possible alternatives, we cannot find error in the district court's conclusion that NEPA did not require a detailed discussion of the no build/heavy rail alternative in the EIS.[67]

## B. Substantive Content of the EIS

■ Appellants next contend that the EIS should be set aside because the agencies' review of the available traffic and environmental information was incomplete or inaccurate. As an initial matter, appellants argue that the clearly erroneous standard should not be applied to the district

court's findings on the adequacy of the traffic projections and environmental studies in the present case since the issues "involve errors of law by the district court which are subject to de novo review in this court."

Resolution of this dispute requires analysis of the relevant environmental documents and traffic projections, so we cannot accept appellants' contentions that our review is of a legal question. The questions presented for review in this section are classic examples of "a factual dispute the resolution of which implicates substantial agency expertise, so we must defer to the informed discretion of the responsible agencies."[68] Accordingly, as noted above, the agencies' decisions on the adequacy of the environmental and traffic data should not be set aside unless arbitrary and capricious.[69]

■ We also cannot accept appellants' contention that the district court erred in placing on them the burden of introducing affirmative evidence in court to prove that the assumptions underlying the traffic and environmental data were incorrect. As plaintiffs in the district court proceeding, appellants were required to establish by a preponderance of the evidence that the EIS was inadequate.[70] In this court, Appellants shoulder the burden here of demonstrating that the district court's findings on the adequacy of the traffic and environmental data were clearly erroneous and this they have failed to do.

## (1) Traffic Projections

■ The traffic projections relied on in rejecting the no build/heavy rail alternative were derived from an analysis of present traffic amounts and projections of future amounts. The ARC provided the applicant, GDOT, with projections of system wide

---

**65.** Other courts have found this adequate justification for eliminating a no build alternative from consideration. *See Lake Heffner Open Space Alliance v. Dole*, 871 F.2d 943, 947 (10th Cir.1989) and cases cited therein.

**66.** *Coalition Against a Raised Expressway v. Dole*, 835 F.2d 803, 808 (11th Cir.1988).

**67.** *Druid Hills*, 772 F.2d at 713.

**68.** *Marsh*, 109 S.Ct. at 1860–61.

**69.** *Id.*

**70.** *Druid Hills*, 772 F.2d at 709; *Sierra Club v. Morton*, 510 F.2d at 818.

traffic amounts for 1990 and 2000 calculated from ARC's computer model. This computer modeling system, accepted by the FHWA, was utilized for other important Atlanta area road construction projects including the Presidential Parkway. The GDOT first calculated a growth trend for the years 1990–2000 from the ARC model. The GDOT projected highway use statistics for the year 2010 by assuming that the calculated growth trend would continue into the next century and by incorporating planned improvements from the RTP. Highway capacity was determined using the transportation research board capacity manual, a national standard for capacity analysis and methodology. In October 1986, the ARC indicated its agreement with the traffic estimate, finding it "consistent with 1990 and 2000 system traffic assignments and with 2010 RDP socio-economic and land use forecasts." [71]

Appellants' attack on the traffic projections centers around GDOT's extrapolated growth trend calculation. According to the appellants, the assumptions underlying these projections are questionable because the computer model ignored the possible beneficial effect of mass transit on surface traffic in in the North Atlanta Corridor. The appellants offer no alternate method of computation and point to no specific errors in the calculations.

In *Druid Hills Civic Assn. v. Fed. Highway Admin.*,[72] this court was called on to determine the propriety of competing traffic projection methodologies. The court recognized that it could not expect the district court to designate itself as a "super professional transportation analyst" to determine the proper traffic planning technique.[73] The same result must obtain here. After reviewing all the evidence, the district court concluded in this case that the plaintiffs failed to show that the traffic computations were unreasonable. The choice of methodology was determined to have a rational basis and was consistently

applied in an objective manner. Our review of the record convinces us that this finding is not clearly erroneous.[74]

### (2) *Environmental Data*

Appellants next argue that the EIS is inadequate because environmental impacts of MARTA rail line extensions outside the project corridor were not fully considered. This argument turns on whether the Medical Center Station which lies beyond the right-of-way north of the highway corridor was given an adequate environmental assessment. The EIS did evaluate the combined environmental effects of the transit median and the multi-lane highway where their routes were congruent. In addition, MARTA studies detailing the environmental consequences of the proposed station outside the right-of-way were incorporated by reference into the EIS.[75] Witnesses at the evidentiary hearing testified that the MARTA environmental studies were considered in conjunction with the EIS in reaching a decision on the merits of the proposed project. It is apparent that the district court, after considering all the evidence in the record before it, found that the cumulative impacts of portions of the project both inside and outside the corridor right-of-way were adequately considered. We see no error in this conclusion.

### C. Exclusion of the UMTA

Finally, appellants contend that the EIS is invalid because UMTA did not participate more fully in the development of the EIS. The FHWA invited UMTA to become a cooperating agency when preparation of the EIS began because MARTA officials were interested in securing federal funding for the construction of the mass transit element of the project. UMTA participated in the scoping process, then reviewed and commented on the draft EIS. Later, however, the agency withdrew from the EIS

---

**71.** *North Buckhead,* No. 88–2744, at 18.

**72.** 772 F.2d at 711.

**73.** *Id.*

**74.** *Druid Hills,* 772 F.2d at 711.

**75.** EIS at pp. 47, 229, 283; *See* 40 C.F.R. § 1502.21.

drafting process. Since the agency had not had an opportunity to review or comment on the study methodologies or the drafts of supporting technical documents related to the transit element of the EIS, UMTA felt that it would be inappropriate for it to be listed as a cooperating agency on the draft EIS. UMTA requested that its name be removed from the list of cooperating agencies before the draft EIS was circulated publicly.

Appellants argue on appeal that had UMTA remained a cooperating agency throughout the preparation of the Georgia 400 EIS, the environmental impact statement would have included a broader alternatives analysis with consideration of heavy rail only. According to appellants, the FHWA excluded UMTA from serving as a bonafide cooperating agency and accepted the agency's withdrawal because the FHWA and the Georgia DOT sought to avoid compliance with UMTA's "New Start" regulations in preparing the EIS. Appellants contend that UMTA's "New Start" regulations would have required a more rigorous and detailed analysis of alternatives and cost effectiveness. As a result, appellants argue, the FHWA excluded UMTA from an active role as a cooperating agency even though UMTA had special expertise in the projection of mass transit ridership numbers and a special interest in the extension of the MARTA system.

The district court resolved this issue through analysis of federal regulations implementing FAHA and NEPA, which define a cooperating agency as "any Federal agency other than a lead agency which has jurisdiction by law or special expertise with respect to any environmental impact involved in a proposal ... for legislation or other major Federal action significantly affecting the quality of the human environment." [76] If an agency has authority to

approve, veto, or finance all or part of the proposal, it has jurisdiction by law. [77] This agency *must be* invited to become a cooperating agency. [78] If, however, an agency has statutory responsibility, agency mission, or related program expertise, it has special expertise. [79] An agency with special expertise *may be* asked to become a cooperating agency. [80]

The district court correctly found that UMTA's involvement as a cooperating agency was not required by the regulations since UMTA did not have jurisdiction by law once MARTA officials decided to use only local funds in the construction of the mass transit portion of the project. The court also found that the FHWA acted within its discretion when it did not seek UMTA's special expertise in projecting ridership numbers; the FHWA had direct access to the transit ridership numbers that UMTA used in making its projections since UMTA would rely on MARTA to supply these numbers.

We agree with the court's conclusion that "the EIS cannot be invalidated because UMTA did not participate more fully in the process." [81] We find that FHWA did not violate any requirement of the federal regulations when it accepted UMTA's request to withdraw as a cooperating agency.

IV. *Conclusion*

As discussed above, this court's role is very limited in the present case. We are not authorized to weigh the relative merits of highways and mass transit or even to determine whether the Georgia 400 Extension should be built at all. These policy decisions are reserved for city and county transportation planning officials. We are required to decide, however, whether the governmental agencies made their decisions concerning the highway in cooperation with these local officials and in con-

**76.** 40 CFR § 1508.5.

**77.** 40 CFR § 1508.15.

**78.** 23 CFR § 771.111(d).

**79.** 40 CFR § 1508.26.

**80.** 23 CFR § 771.111(d)

**81.** *North Buckhead,* No. 88–2744, at 39.

formance with the law.[82] The record indicates that the agencies prepared an EIS which provided a close objective appraisal of the issues suggested in the systems planning process. In the document, the agencies thoroughly evaluated extensive environmental and traffic data in deciding which of the available alternatives would best relieve the traffic congestion in the North Atlanta Corridor. While they may not be satisfied with the result, appellants have failed to prove by a preponderance of the evidence that NEPA has been violated. We agree with the district court's conclusion that the EIS is adequate in light of the purposes it and NEPA were intended to serve; accordingly, the denial of appellants' motion for an injunction and the dismissal of the complaint are AFFIRMED.

**82.** *Coalition Against a Raised Expressway,* 835 F.2d at 812.