[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-12598

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 22, 2012
JOHN LEY
CLERK

Agency No. S-7444

DEFENDERS OF WILDLIFE,
CENTER FOR BIOLOGICAL DIVERSITY,
NATURAL RESOURCES DEFENSE COUNCIL,

Petitioners,

versus

BUREAU OF OCEAN ENERGY MANAGEMENT,
UNITED STATES DEPARTMENT OF THE INTERIOR,
SECRETARY, DEPARTMENT OF THE INTERIOR,
DIRECTOR, BUREAU OF OCEAN ENERGY MANAGEMENT,
REGULATION AND ENFORCEMENT,

Respondents,

SHELL GULF OF MEXICO, INC.,
AMERICAN PETROLEUM INSTITUTE,
STATE OF LOUISIANA,
LOUISIANA DEPARTMENT OF NATURAL RESOURCES,
STATE OF ALABAMA,
GOVERNOR and the STATE OF MISSISSIPPI,

Intervenors.

_____

No. 11-12599

_____

Agency No. S-7444

GULF RESTORATION NETWORK, INC.,
FLORIDA WILDLIFE FEDERATION,
SIERRA CLUB, INC.,

Petitioners,

versus

BUREAU OF OCEAN ENERGY MANAGEMENT,
REGULATION AND ENFORCEMENT,
SECRETARY OF THE DEPARTMENT OF INTERIOR,

Respondents,

SHELL GULF OF MEXICO INC.,
AMERICAN PETROLEUM INSTITUTE,
STATE OF LOUISIANA,
LOUISIANA DEPARTMENT OF NATURAL RESOURCES,
STATE OF ALABAMA,
GOVERNOR and the STATE OF MISSISSIPPI,

Intervenors.

_____

Petitions for Review of a Decision
of the Department of the Interior

_____

(June 22, 2012)

2

Before DUBINA, Chief Judge, EDMONDSON, Circuit Judge, and RESTANI,[*] Judge.

DUBINA, Chief Judge:

This case concerns a challenge to an exploratory drilling plan under the Outer Continental Shelf Lands Act ("OCSLA"). 43 U.S.C. § 1331 *et seq.* The Bureau of Ocean Energy Management[1] ("BOEM") approved the Shell Exploration Plan S-7444 ("Shell EP") to conduct drilling in the Gulf of Mexico. The Shell EP covers ten exploratory wells on offshore Alabama leases in the Central Gulf of Mexico between 7,100 and 7,300 feet deep. This case is a consolidated appeal in which Petitioners, Defenders of Wildlife, *et al.* and Gulf Restoration Network, *et al.* ("Petitioners"), filed comments on the Shell EP, participated in the administrative proceeding below, and filed this petition for review. *See* 43 U.S.C. § 1349(c)(2). The only issues on petition for review are whether the Shell EP violates the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332 *et seq.*, and the Endangered Species Act ("ESA"), 16 U.S.C. § 1536 *et seq.* After

---

[*]Honorable Jane A. Restani, United States Court of International Trade Judge, sitting by designation.

[1]On October 1, 2011, the Bureau of Ocean Energy Management, Regulation, and Enforcement ("BOEMRE"), formerly the Minerals Management Service ("MMS"), was replaced by BOEM and the Bureau of Safety and Environmental Enforcement ("BSEE") as part of a major reorganization.

reviewing the record, reading the parties' briefs, and having the benefit of oral argument, we deny the petition for review.

## I. Background

**(A)** *Agency Proceedings*

OCSLA governs federal offshore oil and gas leasing, exploration, and development, and gives the Secretary of the Interior authority over the administration of offshore leasing. 43 U.S.C. § 1331 *et seq.*, 43 U.S.C. § 1334(a). The Secretary delegated the authority to "regulate oil, gas, and sulphur exploration, development, and production operations on the Outer Continental Shelf (OCS)" to the BOEM. 30 C.F.R. § 550.101. OCSLA uses a four-stage process for oil and gas development, with review at each stage: (1) preparation of a leasing program; (2) lease sales; (3) exploration by the lessees; and (4) development and production. *See Sec'y of the Interior v. California*, 464 U.S. 312, 337–40, 104 S. Ct. 656, 669–71 (1984). During the first stage, the Secretary prepares a five-year OCS oil and gas lease-sale schedule and completes an environmental impact statement ("EIS"). 43 U.S.C. § 1344(a), (b)(3). In the second stage, the Secretary conducts lease sales on tracts of the OCS. 43 U.S.C § 1337. The lessee then has the exclusive right to submit an exploration plan for approval during the third stage. 43 U.S.C. § 1340(c). If the exploration is

4

successful, the lessee can submit development and production plans for the Central and Western Gulf of Mexico. 43 U.S.C. § 1351. The stage at issue in this proceeding is the third stage, exploratory drilling.

A leaseholder must submit an exploration plan for approval by BOEM. *See* 43 U.S.C. § 1340(c)(1). BOEM is required to approve, approve with modifications, or deny a plan within 30 days of submission. *See id*. BOEM may allow exploration to proceed and issue a permit for drilling if the lessee's plan "will not be unduly harmful to aquatic life in the area, result in pollution, create hazardous or unsafe conditions, unreasonably interfere with other uses of the area, or disturb any site, structure, or object of historical or archeological significance." 43 U.S.C. § 1340(g)(3). The exploration plan must also comply with all other applicable laws, including NEPA and ESA. *See* 42 U.S.C. § 4332; 16 U.S.C. § 1536(a).

(1) *Compliance with NEPA*

NEPA requires all federal agencies to prepare an environmental assessment ("EA") and EIS on the environmental effects of proposed federal agency actions. *See* 42 U.S.C. § 4332. All "major Federal actions [that] significantly affect[] the quality of the human environment" require an EIS. 42 U.S.C. § 4332(C). A less exhaustive EA can be used to determine whether the proposed action may

5

significantly affect the environment and whether an EIS is required. *See* 40 C.F.R. § 1508.9. An EIS is not required if the agency makes a finding of no significant impact ("FONSI") that identifies reasons why the proposed action will not have a significant impact on the environment. 40 C.F.R. §§ 1501.4(e), 1508.13.

BOEM applies NEPA procedures using a tiered process encouraged by the Council on Environmental Quality's ("CEQ") regulations implementing NEPA. The CEQ regulations seek to avoid repetitive discussions and urge that:

> Whenever a broad environmental impact statement has been prepared (such as a program or policy statement) and a subsequent statement or environmental assessment is then prepared on an action included within the entire program or policy (such as a site specific action) the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action.

40 C.F.R. § 1502.20. The Shell EA "tiers" from two prior EIS's: the 2007 Multisale EIS covering eleven Gulf lease sales in the 2007-2012 Multisale and the 2009 supplemental EIS for seven remaining lease sales in the 2007-2012 Multisale. In 2007, MMS, BOEM's predecessor, finalized an EIS covering the Western and Central Gulf areas. The 2007 EIS analyzed expected impacts of oil and gas exploration, including possible oil spills. It found large oil spills to be low-probability events and determined that environmental impacts would not be

6

catastrophic to the region, animal populations, and ecosystems. The 2009

supplemental EIS found that relevant new information did not change the

conclusions from the 2007 multisale EIS.

In response to the April 2010 *Deepwater Horizon* disaster,[2] BOEM

commenced the process to prepare a supplemental EIS for the remaining lease

sales in the Gulf under the 2007-2012 Multisale. *See* 75 Fed. Reg. 69,122-01

(Nov. 10, 2010). The final supplemental EIS was issued on January 20, 2012. 77

Fed. Reg. 2,991-02 (Jan. 20, 2012). BOEM concluded that "[n]o substantial new

information, with the exception of archaeological resources [related to historic

shipwrecks], was found that would alter the impact conclusions as presented in

the Multisale EIS and the 2009-2012 Supplemental EIS. . . ." BOEM, *Gulf of*

*Mexico OCS Oil and Gas Lease: 2012*, *Final Supplemental Environmental Impact*

*Statement*, Vol. I at x (Jan. 2012).

Prior to the *Deepwater Horizon* disaster, BOEM generally did not prepare

EA's when approving exploration plans in the Western and Central Gulf of

Mexico under leases studied in previous EIS's. After the spill, the Director of

BOEM instructed the agency to restrict its use of categorical exclusions for

---

[2] The BP Macondo spill began with the April 20, 2010, explosion of the Deepwater Horizon drilling platform and is referred to as the *Deepwater Horizon* disaster.

exploration plans that proposed activity that would require approval of an application for a permit to drill and involve the use of a subsea Blow Out Preventer ("BOP") or surface BOP.[3]  Categorical exclusions are "a category of actions which do not individually or cumulatively have a significant effect on the human environment . . . and for which, therefore, neither an environmental assessment nor an environmental impact statement is required."  40 C.F.R. § 1508.4.  Accordingly, BOEM prepared a site-specific EA for the Shell EP.

(2) *Compliance with ESA*

The ESA requires federal agencies to ensure that their actions are "not likely to jeopardize the continued existence of any endangered species or threatened species."  16 U.S.C. § 1536(a)(2).  If a proposed federal action may affect an endangered species, the agency proposing the action must consult with the appropriate expert agency, either the Fish and Wildlife Service ("FWS") or the National Marine Fisheries Service ("NMFS").  *See* 50 C.F.R. § 402.14(a).  The agency proposing the action prepares a biological assessment to facilitate consultation with the expert agency.  50 C.F.R. § 402.14(c)(5).  If the agencies determine that the proposed action is not likely to adversely affect the species, the consultation process is terminated.  *Id.* § 402.13(a).  However, if either agency

---

[3] Subsea BOPs and surface BOPs are generally used for drilling in deep waters over 500 feet.

determines that the proposed action is likely to adversely affect a species, formal consultation begins. *Id.* § 402.14. An agency must reinitiate consultation if new information arises that was previously unexamined. *Id.* § 402.16.

BOEM consulted with NMFS and FWS in 2007 regarding Gulf of Mexico lease sales under the 2007-2012 Multisale program. NMFS issued an opinion concluding that exploration, development, and production was not likely to jeopardize threatened or endangered species. FWS issued a similar memorandum. In September 2010, BOEM requested to reinitiate consultation with NMFS and FWS to consider new information as a result of the *Deepwater Horizon* disaster, and that consultation is ongoing.

**(B)** *Procedural History*

On March 31, 2011, BOEM deemed the Shell EP submitted. BOEM conducted a review of whether the Shell EP significantly affected the quality of the environment, considering impacts of Shell's proposed effect on the environment from routine operations and unexpected accidents. Appendix A of the EA analyzes risks, characteristics, and impacts of possible major spills in light of information from the *Deepwater Horizon* disaster. Appendix B presents a detailed "Catastrophic Spill Event Analysis" on all relevant resources in the Gulf of Mexico, based on the 2010 *Deepwater Horizon* spill and 1979 Ixtoc spill.

9

Based on this analysis and information in the record, BOEM found no indication that the proposed action would significantly affect the quality of the human environment within the meaning of NEPA. The plan was approved by BOEM and the United States Department of the Interior on May 10, 2011, after a FONSI. Thus, BOEM determined an EIS was unnecessary. Petition for review of the Shell EP was filed on June 9, 2011. Petitioners Gulf Restoration Network, *et al.* seek remand for further agency consideration and Petitioners Defenders of Wildlife, *et al.* seek both vacatur and remand.

## II. Standard of Review

We review a decision to approve an exploration plan "solely on the record made before the Secretary . . . [and] findings of the Secretary, if supported by substantial evidence on the record considered as a whole, shall be conclusive." 43 U.S.C. § 1349(c)(6). We review an agency's compliance with NEPA and ESA under the deferential "arbitrary or capricious" standard. Administrative Procedure Act, 5 U.S.C. § 706(2)(A); *Miccosukee Tribe of Indians v. United States*, 566 F.3d 1257, 1264 (11th Cir. 2009). "We are not authorized to substitute our judgment for the agency's as long as its conclusions are rational." *Miccosukee*, 566 F.3d at 1264 (citing *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008)). We have limited discretion to reverse an agency's decision because when it "is

making predictions, within its area of special expertise, at the frontiers of science . . . as opposed to simple findings of fact, a reviewing court must generally be at its most deferential." *Miccosukee*, 566 F.3d at 1264 (quoting *Balt. Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 103, 103 S. Ct. 2246, 2255 (1983)).

### III. Analysis

**(A)** *NEPA Claim*

BOEM conducted an EA for the Shell EP to determine whether the proposed activity would significantly affect the environment and found that an EIS was unnecessary. Petitioners argue that the EA is only a general summary of the environmental impact of the Shell EP and fails to include site-specific information. Thus, Petitioners insist, BOEM's decision not to prepare an EIS and its subsequent FONSI is a violation of NEPA. Yet, Petitioners simply cannot overcome our extremely deferential "arbitrary or capricious" standard of review. *See Miccosukee*, 566 F.3d at 1264.

(1) *Site-specific Analysis*

Before concluding that an EIS is unnecessary, the agency must "accurately identif[y] the relevant environmental concern" and take a "hard look" at the problem. *Hill v. Boy*, 144 F.3d 1446, 1450 (11th Cir. 1998) (quoting *Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 66–67 (D.C. Cir. 1987)). If a FONSI

11

is made, the agency "must be able to make a convincing case for its finding." *Id.* Contrary to Petitioners' claims, the EA contains a plethora of site-specific information on the potential impacts from Shell's proposed exploratory drilling. For example, the EA describes site-specific atmospheric conditions, water quality characteristics, likely impact on water quality, possible impact on deepwater coral and marine mammals including specific species of sea turtles, and effects of accidental events. Petitioners complain that the Shell EA is too similar to Shell EP S-7445, an EA prepared for a separate but similar exploration plan in a different area in the Gulf of Mexico. Shell EP S-7445 is 130 miles from shore with proposed drilling at 2,721 feet. The difference in location and water depth between the two EAs does not necessarily mean that there are significant differences in resources present and environmental impact because both wells are far from shore and in deep water. BOEM's reliance on and comparison to Shell EP S-7445 is consistent with its requirements under NEPA that it take a hard look at the environmental impacts of the proposed exploration. NEPA does not prohibit an agency from creating an EA that resembles another EA in a similar environment. *See* 40 C.F.R. § 1508.9.

Next, Petitioners argue that BOEM failed to include a site-specific analysis of potential catastrophic spills and underestimated the likelihood of a spill. To the

12

contrary, the EA extensively analyzes the risks and consequences of such an event. Appendix B of the EA, "Catastrophic Spill Event Analysis," evaluates the impact of a low-probability catastrophic spill. After taking into account regulations put into effect after the *Deepwater Horizon* disaster, BOEM determined that the risk of another spill was low. While this analysis is derived from a generalized scenario, it is based on the only two large spill disasters in the Gulf of Mexico—the 1979 Ixtoc blowout in the Bay of Campeche, Mexico and the 2010 *Deepwater Horizon* disaster. An oil spill is an unexpected event, and its parameters cannot be precisely known in advance. Thus, it is appropriate for BOEM to summarize potential impacts resulting from a hypothetical oil spill.

Additionally, Petitioners claim that BOEM's failure to evaluate its worst case discharge spill of 405,000 barrels of oil per day was a violation of NEPA. Yet BOEM is not required to base its NEPA analysis on a worst case scenario. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 354–355, 109 S. Ct. 1835, 1848 (1989) (finding that NEPA does not require a "worst-case" analysis). Similarly, NEPA does not require a "worst case discharge" analysis. Thus, we conclude that BOEM's reliance on analysis based on a lower spill rate, which it determined to be more likely than the worst case discharge, was not arbitrary or capricious or in violation of NEPA.

13

Petitioners' final complaint with BOEM's site-specific analysis is that the EA fails to discuss some endangered species present in the Gulf, including the piping plover, Gulf sturgeon, and various species of beach mice. The purpose of an EA is to give enough information and analysis to conclude whether the project will have a significant effect on the environment or not. *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1214–15 (11th Cir. 2002). This project concerns operations under the Shell EP, not an expected oil spill from those operations. Thus, the *expected* operations under the Shell EP will not have a significant effect on the endangered species identified by Petitioners. Of course, a catastrophic spill is possible, and BOEM considered potential impacts of such a spill, including the impacts on the species identified by Petitioners. Yet, Petitioners suggest that every EA requires a detailed analysis of each species that could possibly be affected by a potential oil spill. NEPA clearly does not require such analysis. An EA is intended to be a document that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS]." 40 C.F.R. § 1508.9(a)(1). Although the EA does not describe every possible environmental effect of an oil spill, BOEM took a hard look at environmental impacts, and its site-specific analysis of expected drilling operations is consistent with NEPA.

(2) *BOEM's Methodology*

14

Petitioner Gulf Restoration Network argues that BOEM should have used the Mechanical Risk Index ("MRI")—a methodology that evaluates risk factors for  deepwater  wells, including water depth, well depth, number of casing strings, and percent of population penetrating salt—to evaluate the risk of a spill under the Shell EP.  However, there is no evidence that suggests MRI is a standard methodology in the industry to assess risks of a blow out.  It is not the duty of this court to determine the propriety of the methodology used by BOEM to analyze the Shell EP, and we are not authorized to substitute our judgment "concerning the wisdom or prudence of the proposed action."  *N. Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1539 (11th Cir. 1990).  We must be extremely deferential "when an agency's decision rests on the evaluation of complex scientific data within the agency's technical expertise."  *Miami-Dade Cnty. v. U.S. EPA*, 529 F.3d 1049, 1065 (11th Cir. 2008) (per curiam).  We conclude from the record that BOEM's choice to not use MRI was not arbitrary or capricious, and we should defer to BOEM's experience and expertise on this matter.

(3) *Environmental Impacts of the Deepwater Horizon Disaster*

Petitioners argue that preparation of an EIS might provide additional information on the *Deepwater Horizon* disaster, and that the agency cannot move forward until additional information is gathered, but fail to realize that complete

information about the extent of damage from the spill may not be available for years. NEPA does not require BOEM to wait until all aspects of a previous disaster are determined before moving forward if the agency deems an EIS unnecessary from a FONSI. Exploration plan approval decisions are based upon existing available information. 43 U.S.C. § 1346(d) ("The Secretary shall consider available relevant environmental information in making decisions (including those relating to exploration plans . . . ), in developing appropriate regulations and lease conditions, and in issuing operating orders."). BOEM is required to take a "hard look" at what is currently known about the environmental impact of a spill like the *Deepwater Horizon* disaster. *See Hill*, 144 F.3d at 1450. The Shell EA details the known environmental impacts from the *Deepwater Horizon* spill, including impacts to fisheries and fish habitats of the oil, natural gas, and chemical dispersants released as a result of the spill and its effects on water quality. Appendix B provides additional information that is largely based on the spill. The record demonstrates that BOEM took a hard look at what it knew about the environmental consequences of the spill, and thoughtfully incorporated that knowledge into the EA, consistent with NEPA requirements.

(4) *BOEM's Reliance on Prior EIS's*

Petitioners argue that BOEM cannot rely on tiering from the 2007 Multisale EIS and 2009 Supplemental EIS because those studies are outdated after the *Deepwater Horizon* disaster. Petitioners contend that because BOEM issued a notice of intent to prepare a supplemental EIS for the 2007-2012 Multisale, which covers the areas where the *Deepwater Horizon* disaster occurred and Shell proposes to drill, BOEM cannot rely on the prior EIS's in the current Shell EP. BOEM recognizes that this supplemental EIS is needed "to consider new circumstances and information arising . . . from the *Deepwater Horizon* blowout and spill." 75 Fed. Reg. 69,122-01 (Nov. 10, 2010). The purpose of the supplemental EIS is to update baseline conditions and environmental impacts in the Gulf.

The purpose of OCSLA is the "expedited exploration and development of the Outer Continental Shelf in order to achieve national economic and energy policy goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments in world trade." 43 U.S.C. § 1802(1). BOEM has a responsibility to balance the needs under OCSLA with the requirements of NEPA. Absent unique site-specific characteristics, BOEM is entitled to rely on broader prior analyses and tiering is specifically encouraged by NEPA regulations. *See* 40 C.F.R. § 1502.20. Tiering allows BOEM to rely on

17

prior work to inform a decision on a current lease. BOEM validly relied on the prior EIS's, but also evaluated mitigation measures adopted after the *Deepwater Horizon* disaster as factors to consider in determining the current risk of an oil spill. The agency's reliance on previous studies was not arbitrary or capricious because (1) BOEM included all known information about the spill in the Shell EP and (2) on January 20, 2012, BOEM reported that the conclusions from the most recent supplemental EIS would not alter any conclusions presented in the 2007 and 2009 EIS's. We conclude that BOEM's reliance on the 2007 Multisale EIS and 2009 Supplemental EIS was not arbitrary or capricious.

**(B)** *ESA Claim*

We next turn to Petitioners' claim that BOEM's request to reinitiate consultation conceded the inadequacy of prior consultations and effectively barred BOEM from approving the Shell EP until consultation was complete. If a federal agency determines that a proposed action will likely affect a species protected under the ESA, it must consult with either NMFS or FWS. *See* 16 U.S.C. § 1536(a)(2). Following the *Deepwater Horizon* disaster, BOEM reinitiated consultation with both NMFS and FWS, and those consultations are still ongoing.

Section 7(a)(2) of the ESA requires BOEM to insure that its action "is not likely to jeopardize" any endangered or threatened species or destroy or adversely

modify such species' habitat. 16 U.S.C. § 1536(a)(2). NMFS and FWS

regulations define "jeopardize the continued existence of" as "to engage in an

action that reasonably would be expected, directly or indirectly, to reduce

appreciably the likelihood of both the survival and recovery of a listed species in

the wild by reducing the reproduction, numbers, or distribution of that species."

50 C.F.R. § 402.02. Because BOEM acknowledged that the environmental effects

from the *Deepwater Horizon* disaster may have altered some species or habitats, it

reinitiated consultation with NMFS and FWS. However, BOEM's reliance on

conclusions by NMFS and FWS from 2007 does not necessarily jeopardize the

continued existence of any species or adversely modify a critical habitat under the

Shell EP. Petitioners have no proof that endangered species are in jeopardy, but

instead argue that the prior consultations are inadequate because BOEM reinitiated

consultation.

There is no precedent in our circuit to support Petitioners' argument that

BOEM's choice to reinitiate consultation with NMFS and FWS automatically

renders the former biological opinions invalid.[4] The biological opinions of NMFS

---

[4] Petitioners cite to dicta in *Envtl. Prot. Info. Ctr. v. Simpson Timber Co.*, for the proposition that "[r]einitiation of consultation requires either the FWS or the NMFS to issue a new Biological Opinion before the agency action may continue." 255 F.3d 1073, 1076 (9th Cir. 2001) (citing *Mt. Graham Red Squirrel v. Madigan*, 954 F.2d 1441, 1451 (9th Cir. 1992)). We decline to give this statement any weight since ESA has no such requirement.

and FWS were reconfirmed in 2008 and 2009, and have not been withdrawn despite reinitiation of consultations.[5]  We need not determine whether continuing exploratory drilling would violate 16 U.S.C. § 1536(d)[6] if no biological opinion were in place, because BOEM "consider[ed] the existing consultation to remain in effect until the reinitiated consultation is completed" and under the facts of this case that decision is not arbitrary or capricious.  [Admin. R. 27 at 2.]  First, BOEM engaged in extensive consideration of the impact of the *Deepwater Horizon* disaster on the environment and BOEM's ESA obligations.  BOEM stated that the

---

[5]Reinitiation of consultation is required, in part:

. . . (b) If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;

(c) If the identified action is subsequently modified in a manner that causes an affect to the listed species or critical habitat that was not considered in the biological opinion . . . .

50 C.F.R. § 402.16(b), (c).  NMFS and FWS agreed to further consultation based on these standards. They expressed no opinion on the effect of the 2007 opinion.

[6] Section 7(d) states in full:

After initiation of consultation required under subsection (a) (2) of this section, the Federal agency and the permit or license applicant shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a) (2) of this section.

16 U.S.C. § 1536(d).

20

risks revealed by the *Deepwater Horizon* disaster are mitigated by "new notices of lessees and safety regulations," as well as "improvements in containment technology." [Admin. R. 35 at 3.] The Site-Specific Assessment of the Shell EP addressed the possibility of events similar to the *Deepwater Horizon* disaster, finding that although the effects of the spill on protected species were unknown, to the extent effects could be predicted, the assessment foresaw greater risk to some protected species, such as various species of sea turtles, and population level risks to other species, such as manatees. BOEM concluded that despite the recent *Deepwater Horizon* disaster, "impacts are still expected to be minimal to nonexistent based on the low probability of a spill occurring," estimating the risk of an accidental spill at 0.07%. [Admin. R. 338 at 39.] Given the Bureau's broad consideration of the *Deepwater Horizon* disaster and new safety measures, the Bureau did not act arbitrarily when it relied on the 2007 consultation in conjunction with more recent studies. Second, BOEM analyzed its ESA obligations and noted that under OCSLA it could promptly suspend activities if it realized during the reinitiated consultation with NMFS or FWS that such action was necessary to avoid jeopardy to threatened or endangered species. On these facts, the ESA does not require BOEM to delay approval of the Shell EP until results of reinitiated consultation are received.

21

## V. Conclusion

For the reasons stated above, we conclude that BOEM's decision to approve the Shell EP was not arbitrary or capricious and instead reflects the agency's balance of environmental concerns with the expeditious and orderly exploration of resources in the Gulf of Mexico.

**PETITION FOR REVIEW DENIED.**