MT. GRAHAM RED SQUIRREL, (Tamiasciurus hudsonicus grahamensis), an endangered species, Sierra Club, a non-profit corporation, National Audubon Society, a non-profit corporation, National Wildlife Federation, a non-profit association, Arizona Wildlife Federation, a non-profit corporation, Maricopa Audubon Society, a non-profit association, Tucson Audubon Society, a non-profit association, Prescott Audubon Society, a non-profit association, Yuma Audubon Society, a non-profit association, Northern Arizona Audubon Society, a non-profit association, Defenders of Wildlife, a non-profit organization, Wayne Woods, an individual, Plaintiffs–Appellants,

v.

Edward R. MADIGAN,* in his official capacity as Secretary of Agriculture; F. Dale Roberton, in his official capacity as Chief Forester, U.S. Forest Service, David F. Jolly, in his official capacity as Regional Forester for the Southwestern Region, Manuel Lujan, in his official capacity as Secretary of the Interior, Steven Robinson, in his official capacity as Interim Director of the U.S. Fish and Wildlife Service, Defendants–Appellees,

and

State of Arizona Board of Regents, University of Arizona, Defendant-intervenor-Appellee.

Nos. 89–16138, 90–15400, 90–16125 and 90–16172.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 13, 1990.

Opinion Filed Dec. 11, 1991.

Opinion Withdrawn Jan. 21, 1992.

Opinion Filed Jan. 21, 1992.

* Edward R. Madigan is substituted for Clayton Yeutter, Secretary of Agriculture, pursuant to Fed.R.App.P. 43(c)(1).

Mark Hughes, Fern L. Shepard, Thomas T. Ankersen, Sierra Club Legal Defense Fund, Denver, Colo., for plaintiffs-appellants.

William Perry Pendley, Todd S. Welch, C. Thomas Blickensderfer, Mountain States Legal Foundation, Denver, Colo., for applicants for intervention-appellants.

David C. Todd, Sheila M. Foran, Patton, Boggs & Blow, Washington, D.C., for defendant-intervenor-appellee.

Thomas M. Thompson, The University of Arizona, Tucson, Ariz., for defendant-intervenor-appellee.

Richard B. Stewart, Asst. Atty. Gen., Gerald S. Frank, Asst. U.S. Atty., Tucson, Ariz., Larry J. Bradfish, Martin W. Matzen, M. Alice Thurston, U.S. Dept. of Justice, Washington, D.C., for defendants-appellees.

Before TANG, FLETCHER and REINHARDT, Circuit Judges.

### ORDER

The opinion filed December 11, 1991, is withdrawn.

## OPINION

REINHARDT, Circuit Judge:

This is a case about difficult choices. In 1988, Congress was asked to choose between ensuring that our nation remains a world leader in astrophysical research or protecting from almost certain demise an endangered species on the brink of extinction. Congress attempted a compromise by passing the Arizona–Idaho Conservation Act, Title VI, Mount Graham International Observatory, Pub.L. No. 100–696, 102 Stat. 4571, 4597 (1988). Unfortunately, it did not make its choice as clear as it might, or, perhaps, should have. Inevitably, passage of the Act did not end the conflict between those who would build bigger and better telescopes and those who would shelter the endangered Mount Graham red squirrel from the destruction of its habitat. That ongoing struggle has led directly to the controversy that confronts us today. The courts are now required to make Congress's difficult choice clear.

### I. FACTS

At the center of the controversy is an area of land located on Mount Graham, which is part of the Pinaleno Mountains in the Coronado National Forest in southeastern Arizona. Among Mount Graham's promontories are High Peak and Emerald Peak. Elevations on Mount Graham exceed 10,000 feet. The mountain, which is surrounded by desert, is far from the lights, noise, and activity of any major population center. It is not, however, untouched by humans. For many years, Mount Graham has been the site of logging, camping, and other human activities. It currently houses a Bible Camp and many summer homes.

Mount Graham's high altitude and relative isolation have provided a unique biological environment, inhabited by plant and animal species found nowhere else in the world. Among those species is the endangered Mt. Graham red squirrel. The red squirrel, which was once thought to be extinct, has a population most recently estimated at 250–300.[1] It is dependent for its

---

1. This figure is based on the October 31, 1990, census. An October census does not reflect the average annual population, as population figures are routinely higher in the fall than in the

survival on the continued existence of old-growth spruce and fir forest habitat, of which very little remains.[2] The red squirrel is now "particularly vulnerable to any disturbance that might bring about further declines in its already precariously low numbers and weakening of genetic viability." Determination of Endangered Status for the Mount Graham Red Squirrel, 52 Fed.Reg. 20,994, 20,998 (1987). According to the Sierra Club, if the red squirrel becomes extinct it will be the first mammalian extinction in the United States since the passage of the Endangered Species Act of 1973, Pub.L. No. 93–205, 87 Stat. 884 (codified as amended at 16 U.S.C. §§ 1531–1544).

The high altitude and isolation of Mount Graham, in addition to providing the unique environment necessary to sustain the red squirrel, make astrophysicists consider that location the best available site in the United States for astronomical research. In 1984, an international consortium led by the University of Arizona ("University") and including the Vatican Observatory, the Max Planck Institute of Radioastronomy of West Germany, Ohio State University, and Arcetri Astrophysical Observatory of Florence, Italy, proposed the construction of the most sophisticated array of telescopes ever assembled, including the world's largest, on Mount Graham. The astrophysical complex, as originally proposed, would include thirteen telescopes, support facilities, and an access road. It would be built in the red squirrel's last remaining undisturbed habitat. Members of the international consortium have indicated that if the astrophysical complex is not built on Mount Graham, it will be built in another country.

In response to the international consortium's proposal and pursuant to the National Environmental Policy Act, 42 U.S.C. §§ 4321–4370c, in 1985 the Forest Service began to prepare an Environmental Impact Statement[3] regarding the effect of constructing the proposed astrophysical complex on Mount Graham. The draft Environmental Impact Statement that the agency released the following year identified a "preferred alternative" in which only five telescopes would be constructed, and in which the complex would be located on High Peak. In 1987, the Forest Service completed a Biological Assessment[4] of its preferred alternative pursuant to section 7 of the Endangered Species Act, 16 U.S.C. § 1536. Meanwhile, the Fish and Wildlife Service listed the Mount Graham red squirrel as endangered.[5] 52 Fed.Reg. 20,994 (1987). Pursuant to section 7 of the Endangered Species Act, the Forest Service initi-

---

spring due to spring breeding. Nevertheless, the October 1990 estimate represents an apparent increase in the number of red squirrels over the past few years, although biologists caution that more data is needed in order to determine whether the numbers represent a genuine increase or merely a lull in the overall decline. The recent census data is as follows:

| Census Date | Population Estimate |
|---|---|
| Fall 1990 | 250–300 |
| Spring 1990 | 132–146 |
| Fall 1989 | 162–185 |
| Spring 1989 | 116–167 |
| Fall 1988 | 178–226 |

**2.** The red squirrel relies on old-growth spruce and fir for several reasons. First, the major food source for the red squirrel is seeds from cone crops. The cones on which the red squirrel depends are primarily produced by Engelmann spruce, Douglas fir, and corkbark fir. Second, the forest canopy that old growth creates provides a cool, moist floor that facilitates food storage. Finally, the large trees are ideal for nesting and are indispensable for travel and escape.

**3.** The National Environmental Policy Act requires that a federal agency prepare an Environmental Impact Statement when it recommends "proposals for legislation and other major Federal actions significantly affecting the quality of the human environment...." 42 U.S.C. § 4332(2)(C). The Environmental Impact Statement must cover, among other things, "statements considering alternatives, a full and fair discussion of significant environmental impacts, a discussion on mitigation measures and an evaluation of cumulative impacts." *Sierra Club v. Penfold,* 857 F.2d 1307, 1312 (9th Cir.1988) (citing 40 C.F.R. § 1502.1–.25).

**4.** A Biological Assessment must be completed "for the purpose of identifying any endangered species or threatened species which is likely to be affected by [an agency] action." 16 U.S.C. § 1536(c)(1).

**5.** The Endangered Species Act defines an endangered species as "any species which is in danger of extinction throughout all or a significant portion of its range...." 16 U.S.C. § 1532(6).

ated "formal consultation" with the Fish and Wildlife Service regarding whether and under what circumstances an astrophysical complex should be permitted on Mount Graham in light of the endangered status of the red squirrel.[6] The Fish and Wildlife Service tentatively concluded that it would agree to development on High Peak, but not to any development on Emerald Peak. Before it could finalize these conclusions, however, the University of Arizona notified the Forest Service that the High Peak alternative did "not provide for or allow a viable cost-effective research facility." The Forest Service suspended formal consultation and requested that the University present its own proposal for a "minimum viable observatory."

In late 1987, the University proposed the construction of three telescopes on High Peak and four telescopes on Emerald Peak, along with support facilities and access roads. The Forest Service prepared a new Biological Assessment, based on the University's proposal, and reinitiated formal consultation with the Fish and Wildlife Service. The Fish and Wildlife Service then issued a Biological Opinion[7] in 1988. The Biological Opinion stated that "The long term survival and recovery of the red squirrel depends upon increasing the quality and quantity of habitat, and concurrently eliminating or reducing man-caused mortality and interference with red squirrel reproduction. Elimination of the fragmentation within existing habitat and restoration of other contiguous potential habitat areas will be especially important." The Biological Opinion further found that "establishment of the seven telescope Mt. Graham Observatory on Emerald and High Peaks is likely to jeopardize the continued existence of the endangered Mt. Graham red squirrel because this plan significantly increases the existing jeopardy status of this squirrel." Nevertheless, the Biological Opinion contained three "reasonable and prudent alternatives,"[8] two of which provided for the construction of an astrophysical complex on Mount Graham.[9] Surpris-

6. The purpose of formal consultation is to "insure that any action authorized, funded, or carried out by [a federal] agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical...." 16 U.S.C. § 1536(a)(2).

The requirements for formal consultation are spelled out in 50 C.F.R. § 402.14. The duty to consult is ongoing, and formal consultation must be reinitiated in specified circumstances, including the discovery of "new information reveal[ing] effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered." 50 C.F.R. § 402.16.

7. Formal consultation terminates with the issuance of a Biological Opinion. 50 C.F.R. § 402.02. A Biological Opinion "states the opinion of the [Fish and Wildlife] Service as to whether or not the Federal action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." *Id.*

8. "Reasonable and prudent alternatives" are alternatives to the proposed action that are identified during formal consultation. They consist of alternative actions "that can be implemented in a manner consistent with the intended purpose of the action, that can be implemented consistent with the scope of the Federal agency's legal authority and jurisdiction, that [are] economically and technologically feasible, and that the Director believes would avoid the likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.02.

9. Reasonable and Prudent Alternative One would prohibit the construction of an astrophysical complex anywhere in the Pinalenos, and would close and reforest existing roads. The astrophysical complex would be built elsewhere in the world.

Reasonable and Prudent Alternative Two would permit the development of 2–3 telescopes at High Peak. It deferred a decision on the development of additional telescopes pending the results of a ten-year study on the effect of construction on the red squirrel. However, any request before the expiration of ten years to reinitiate formal consultation and make a decision regarding additional development, including development on Emerald Peak, would be accommodated. This alternative would provide for the immediate removal of the Bible Camp and summer homes currently existing on Mount Graham, and for the reforestation of those areas. Various other mitigation measures would also be taken. The alternative would permit an "incidental take" of six red squirrels per year. "Incidental take" means "takings that result from, but are not the purpose of, carrying out

ingly, one of the two alternatives, Reasonable and Prudent Alternative Three, provided for construction on Emerald Peak, contrary to the Fish and Wildlife Service's earlier conclusion that development on Emerald Peak would be environmentally unsound. Had Congress not become involved, the next step would have been for the Forest Service to select one of the three alternatives as its preferred proposal. *See* 50 C.F.R. § 402.15.

Frustrated by the delay, the University sought to circumvent the ordinary procedure through congressional action. In 1988, the University lobbied Congress to pass legislation authorizing the immediate construction of an astrophysical complex on Mount Graham. The University's draft legislation provided: "Notwithstanding any other act, law, rule, or regulation, the Secretary of Agriculture is hereby authorized and directed to enter into a land use agreement with the ... University of Arizona for the establishment of the Mt. Graham International Observatory Research Site."

Although Congress rejected the University's broad language, it did enact legislation providing for the establishment of an astrophysical complex on Mount Graham. In the Arizona–Idaho Conservation Act,[10] Congress essentially assumed the role the Forest Service would ordinarily have played and made a selection among the three "reasonable and prudent" alternatives, choosing Alternative Three—the one that permitted construction on Emerald Peak, the most vital portion of the red squirrel's habitat. In addition, in order to expedite the

process, Congress decided to limit drastically the applicability of certain statutory environmental procedures to the project.

The Arizona–Idaho Conservation Act splits the construction of the astrophysical complex into two phases. It first states that "Subject to the terms and conditions of Reasonable and Prudent Alternative Three of the Biological Opinion, the requirements of section 7 of the Endangered Species Act shall be deemed satisfied as to the issuance of a Special Use Authorization for the first three telescopes and the Secretary shall immediately approve the construction of ... (1) three telescopes to be located on Emerald Peak; (2) necessary support facilities; and (3) an access road to the Site." Arizona–Idaho Conservation Act, sec. 602(a). The Act further provides that "[t]he Secretary shall, subject to the requirements of the Endangered Species Act and other applicable law, authorize the construction of four additional telescopes on Emerald Peak. Consultation under section 7(a)(2) of the Endangered Species Act with respect to the four additional telescopes ... shall consider, among other things, all biological data obtained from monitoring the impact of construction of the first three telescopes upon the Mount Graham red squirrel." *Id.* sec. 603. The Act requires that the University, with the concurrence of the Secretary of Agriculture, develop and implement a Management Plan "consistent with the requirements of the Endangered Species Act and with the terms and conditions of Reason-

an otherwise lawful activity conducted by the Federal agency or applicant." 50 C.F.R. § 402.02. The Forest Service would be required to reinitiate consultation with the Fish and Wildlife Service if the incidental take provision was exceeded.

Finally, Reasonable and Prudent Alternative Three would permit the development of three telescopes on Emerald Peak. It deferred a decision on the development of additional telescopes pending the results of a ten-year study regarding the effect of construction on the red squirrel. Like Reasonable and Prudent Alternative Two, this alternative would require that any request to reinitiate formal consultation and make a decision regarding further development on Emerald Peak before the expiration of ten years be accommodated. No development

would be permitted at any time on High Peak. A new, shorter access road would be constructed and existing roads would be closed and reforested. This alternative would also provide for the immediate removal of the Bible Camp and summer homes currently existing on Mount Graham, and for the reforestation of those areas. Various other mitigation measures would also be taken. The alternative would permit an "incidental take" of six red squirrels per year. The Forest Service would be required to reinitiate consultation with the Fish and Wildlife Service if the incidental take provision was exceeded.

10. Because the statute is not codified in the United States Code, we attach it as an appendix to the opinion.

able and Prudent Alternative Three of the Biological Opinion, for the Site." *Id.* sec. 604(a). Finally, the Act modifies the provisions of Reasonable and Prudent Alternative Three in that it delays the closure of the summer homes and Bible Camp currently located on Mount Graham. *Id.* sec. 605.

In April 1989, the Secretary of Agriculture issued the University a permit for the first phase of construction of the astrophysical complex. The permit allows construction of the first three telescopes on Emerald Peak. Construction will take place on a total of 8.6 acres of the 1,750 acres designated in the Biological Opinion as a Refugium for the red squirrel.[11] The permit is conditioned on compliance with the Management Plan required by the Arizona–Idaho Conservation Act and the terms and conditions of Reasonable and Prudent Alternative Three. Construction of the access road has now been completed and most if not all of the acres allotted to the first phase of the project have already been cleared or transplanted.[12]

The Sierra Club and a coalition of environmental organizations ("Sierra Club") seek an immediate halt to all construction relating to the first phase of the project— the first three telescopes—alleging violations of the Endangered Species Act, the National Forest Management Act, and the terms and conditions of the Arizona–Idaho Conservation Act. Their allegations primarily center on the existence of factual circumstances requiring that the Forest Service and the Fish and Wildlife Service reinitiate formal consultation; they also allege monitoring and road closure violations, a violation by the Fish and Wildlife Service regarding failure to designate critical habitat, and a violation by the Forest Service regarding failure to maintain sufficient habitat for a viable population of red squirrels. The most significant dispute between the parties is whether the Endangered Species Act requires further consultation between the Forest Service and the Fish and Wildlife Service before construction on the first phase of the project may proceed. The plaintiffs' complaint seeks both declaratory and injunctive relief. On appeal, we address not only the plaintiffs' allegations, but also the district court's denial of a motion by Mountain States Legal Foundation and a coalition of business interests to intervene.

Ultimately, we conclude, with respect to the principal issue, that no further consultation is required prior to the construction of the first three telescopes. However, as we have already noted, when Congress chose the governing statutory language it failed to make that decision clear. Moreover, the process by which Congress reached its decision was less than satisfactory. No committee hearings were held and no committee reports issued. Following passage of the Act, individual members of Congress sought reconsideration. However, they were all unsuccessful. We are therefore required to make the best sense we can of the legislation as originally enacted, regardless of any questions we may have as to its wisdom. It is in that light that we proceed to resolve this part of the appeal—and do so in favor of the defendants. With respect to the other issues

**11.** The United States General Accounting Office noted that when the effects of clearing on surrounding habitat are taken into consideration, the total area affected will be approximately 45 acres. The General Accounting Office further noted that of the many acres available to and suitable for the red squirrel, only four percent are classified in the Biological Opinion as "excellent" and only thirteen percent are classified as "good." At the time the Biological Opinion was issued, sixty percent of the red squirrels lived on the "good" and "excellent" acreage. All of the project buildings and over one quarter of the new access road will be built in those prime locations.

Since the permit was issued, the area known as a Refugium has been officially designated as critical habitat for the red squirrel. *See* 55 Fed.Reg. 425 (1990).

**12.** Sierra Club noted that even after *all* the land allotted to the first phase of construction has been cleared, the remaining construction activity will have a negative impact on the red squirrel. As the Biological Opinion found, noise, strange smells, vibrations, and the intrusion of large equipment into the red squirrel's critical habitat will all affect the red squirrel. The effect will likely be greatest on females with young. The construction activity will occur during the nesting season.

raised by the plaintiffs, we also conclude that the defendants must prevail.[13]

## II. PROCEDURAL HISTORY

On July 26, 1989, Sierra Club filed a complaint in the United States District Court for the District of Arizona against the Secretary of Agriculture, the U.S. Forest Service, the Secretary of the Interior, and the U.S. Fish and Wildlife Service. The complaint stated nine claims for relief, resting on alleged violations of the Endangered Species Act, the National Forest Management Act, and the Arizona–Idaho Conservation Act. The history of this case involves numerous proceedings in the district court as well as multiple appeals. We describe the nature and history of each appeal separately.

### A. The "Road Appeal"

On August 22, 1989, Sierra Club moved for a preliminary injunction barring construction of the astrophysical complex. The district court scheduled a hearing on the motion for September 8, 1989. On August 30, however, while presiding over a hearing on the University's motions to intervene as a defendant and to dismiss the complaint with prejudice,[14] the district court announced its decision not to hold the preliminary injunction hearing until after the access road was substantially completed. When Sierra Club noted that its only option was an appeal, the district court stated, "You really break my heart." Sierra Club then appealed. A motions panel of this court denied Sierra Club's motion to enjoin construction of the access road pending appeal. The road was constructed prior to the time we heard oral argument.

### B. The "Summary Judgment Appeal"

On June 4, 1990, the district court granted summary judgment to the defendants on seven of Sierra Club's nine claims.[15] Among the claims rejected in this order was the claim that, pursuant to section 7 of the Endangered Species Act, further consultation prior to construction of the first phase of the project was required. The order also rejected the claim that the Forest Service had violated the National Forest Management Act by failing to maintain a minimum viable population of red squirrels, the claim that the Fish and Wildlife Service had violated section 4 of the Endangered Species Act by failing to designate critical habitat in a timely manner, and the claims that the Forest Service had violated section 9 of the Endangered Species Act by "taking" the Mount Graham red squirrel.[16] The district court certified its order of partial summary judgment for immediate appeal pursuant to Fed.R.Civ.P. 54(b).

### C. The "Jurisdictional Appeal"

In June 1990, at the request of Senators McCain and DeConcini of Arizona, the General Accounting Office investigated the question whether the Biological Opinion was biologically unsound. It concluded that Reasonable and Prudent Alternative Three was unsupported by biological studies, that the Fish and Wildlife Service regional director who mandated the inclusion

---

13. No party has mentioned and, notwithstanding our normal rules, we do not consider, the standing of the first-named party to bring this action. *Cf. Sierra Club v. Morton,* 405 U.S. 727, 741–52, 92 S.Ct. 1361, 1369–74, 31 L.Ed.2d 636 (1972) (Douglas, J., dissenting).

14. The district court granted the University's motion to intervene and took the motion to dismiss under advisement.

15. The district court explained its grant of summary judgment as resting on a May 15 order by a motions panel of this court. That order stayed an injunction that the district court had issued barring construction of the astrophysical complex for 120 days in order to give Congress an opportunity to "take another look" at the question of authorizing construction. The order stated: "It does not appear from this record that the evidence presented to the district court constituted new information that revealed effects of the proposed telescope project not previously considered by Congress. It appears, therefore, that plaintiffs' claims under the Endangered Species Act and the Arizona Idaho Conservation Act do not raise a serious question. Accordingly, appellant has demonstrated a likelihood of success on the merits of this appeal."

16. Sierra Club does not raise the section 9 claims on appeal.

of that alternative in the Biological Opinion had based his decision partly on nonbiological considerations, and that recent evidence indicated that the status of the red squirrel had worsened since the issuance of the Biological Opinion. The General Accounting Office presented those conclusions at a congressional joint oversight hearing.[17] Three days later, three members of the Arizona congressional delegation[18] requested that the Fish and Wildlife Service prepare a "Biological Update" of the Biological Opinion. The Biological Update, which was released on August 6, recommended the reinitiation of consultation pursuant to section 7 of the Endangered Species Act.[19]

Relying on the Biological Update, Sierra Club moved to enjoin construction pursuant to claims 5 and 9—the only claims on which the district court had not granted summary judgment.[20] The district court denied the motion, stating that it lacked jurisdiction over the motion because Sierra Club's reconsultation claims were already on appeal (the "Summary Judgment Appeal"). The court stated in addition that it would deny a motion for an injunction pending appeal. A motions panel of this court granted a stay pending appeal but later reversed itself and vacated the stay order.

Following oral argument, we issued an order of limited remand to the district court directing it to consider one of the issues raised in the "Jurisdictional Appeal":

whether it should temporarily enjoin construction based on Sierra Club's allegation that the monitoring program, which was intended to measure the impact of construction on the red squirrel, was being conducted in violation of the Arizona–Idaho Conservation Act. *See Mount Graham Red Squirrel v. Yeutter*, 930 F.2d 703 (9th Cir.1991). Our limited remand regarding the monitoring program did not dispose of the "Jurisdictional Appeal" in full. In this opinion, we address the remaining issues.

**D. The "Intervention Appeal"**

On October 26, 1989, Mountain States Legal Foundation ("Mountain States")[21] moved to intervene as a defendant. The district court denied the motion on November 20, 1989. On January 2, 1990, Mountain States moved for reconsideration. The district court denied that motion on January 16. On March 2, Mountain States appealed from both the order denying intervention and the order refusing to reconsider the petition for intervention. Although Mountain States initially sought permissive intervention as well as intervention of right, only the intervention of right claim is raised on appeal.

**III. THE MERITS OF THE VARIOUS APPEALS**

**A. The "Road Appeal"**

■ By delaying a hearing on Sierra Club's motion to enjoin construction of the

17. The hearing took place before the House Subcommittee on National Parks and Public Lands, of the Committee on Interior and Insular Affairs, and the House Subcommittee on Fisheries and Wildlife Conservation and the Environment, of the Committee on Merchant Marine and Fisheries.

18. Senators McCain and DeConcini, and Representative Kyl.

19. The recommendation was premised on the existence of factual circumstances that had developed following the issuance of the Biological Opinion, including recent statistics regarding the red squirrel population, congressional modifications to Reasonable and Prudent Alternative Three, and the designation of critical habitat.

20. Both claims 5 and 9 involved compliance with the terms and conditions of the Arizona–

Idaho Conservation Act. Claim 5 alleged that the Forest Service had violated the provisions of the Arizona–Idaho Conservation Act by failing to implement the terms and conditions of Reasonable and Prudent Alternative Three of the Biological Opinion. Specifically, Sierra Club alleged that the monitoring program was improper, that certain roads required to be closed remained open, and that the Forest Service had failed to reinitiate consultation in violation of the Arizona–Idaho Conservation Act. Claim 9 alleged that the Forest Service's failure to implement the terms and conditions of Reasonable and Prudent Alternative Three constituted a "taking" of the Mount Graham red squirrel in violation of section 9 of the Endangered Species Act.

21. Mountain States Legal Foundation was joined by fourteen other named parties, including local chambers of commerce and other business organizations.

astrophysical complex until after the access road had been substantially completed, the district court effectively denied the motion to the extent that it related to construction of that road. *See* 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2962, at 614 (1973) ("when a court declines to make a formal ruling on a motion for a preliminary injunction, but its action has the effect of denying the requested relief, its refusal to issue a specific order will be treated as equivalent to the denial of a preliminary injunction and will be appealable"); *see also Cedar Coal Co. v. United Mine Workers*, 560 F.2d 1153, 1161–62 (4th Cir.1977) ("the indefinite continuance amounted to the refusing of an injunction and is appealable"), *cert. denied*, 434 U.S. 1047, 98 S.Ct. 893, 54 L.Ed.2d 798 (1978). At the time the "Road Appeal" was filed, therefore, we clearly had jurisdiction to review the district court's decision.

■ Before we had an opportunity to rule on the "Road Appeal," the district court granted summary judgment to the defendants on seven of Sierra Club's nine claims. The "Road Appeal" raises the same issues that we decide *infra* in connection with the "Summary Judgment Appeal." Thus, we are asked to review simultaneously a denial of preliminary injunctive relief and an ultimate decision on the merits. Our disposition of the "Summary Judgment Appeal" affirms the district court's grant of summary judgment. Given that fact, a reversal of its denial of preliminary injunctive relief would have no practical consequences. Accordingly, we dismiss the "Road Appeal" as moot.[22]

■ Our dismissal does not alleviate our dismay at the district court's refusal to schedule a hearing on Sierra Club's motion for a preliminary injunction barring construction of the access road. Construction of the road represented a major portion of the alleged harm to the red squirrel.[23] The only explanation that we find for the district court's refusal to schedule a half-day hearing is the awkwardness of balancing a hearing in this case with the demands of other cases. That rationale is insufficient.[24]

## B. The "Summary Judgment Appeal"

### 1. *Reinitiation of Consultation Claims*

■ In two of the claims on which summary judgment for the defendants was granted, Sierra Club asserted that, prior to engaging in any construction, the Forest Service was required to *reinitiate* formal consultation with the Fish and Wildlife Service pursuant to section 7 of the Endangered Species Act. That section requires a "Federal agency"—in this case, the Forest Service—to initiate formal consultation with the Fish and Wildlife Service whenever an action by that agency is likely to affect an endangered species or its critical habitat. 16 U.S.C. § 1536(a)(2). Formal consultation concludes with the issuance of a Biological Opinion by the Fish and Wildlife Service. *Id.* § 1536(b)(3)(A). *See generally Thomas v. Peterson*, 753 F.2d 754, 763 (9th Cir.1985).

Under section 7, new circumstances may require *reinitiation* of formal consultation. Regulations promulgated by the Fish and Wildlife Service provide that reinitiation of consultation shall occur in the following circumstances:

(a) If the amount or extent of taking specified in the incidental take statement is exceeded;

(b) If new information reveals effects of the action that may affect listed spe-

---

22. Our disposition does not require us to address the University's argument that the appeal is moot because the access road has now been completely constructed.

23. According to the University, "construction of the access road represents 64 percent of the 8.6 acre allocation for the first three telescopes, and accounts for 90 percent of the impact, including 'edge effects.'"

24. Sierra Club informed the district court repeatedly that a hearing was required in order for it to present its case effectively, as its arguments would be best explained through the testimony of expert witnesses. Neither the defendants nor the district judge disputed this assertion.

cies or critical habitat in a manner or to an extent not previously considered;

(c) If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion; or

(d) If a new species is listed or critical habitat designated that may be affected by the identified action.

50 C.F.R. § 402.16. Reinitiation of consultation requires the Fish and Wildlife Service to issue a new Biological Opinion before a project may go forward.

Sierra Club argues that under paragraphs (b), (c), and (d) of the regulation, factual circumstances now exist to trigger reinitiation of formal consultation regarding construction of the first phase of the Mount Graham astrophysical complex.[25] Whether such circumstances exist is relevant only if the requirements of section 7 apply. Clearly those requirements would be applicable in the absence of the Arizona–Idaho Conservation Act. The parties disagree, however, over the effect of that statute on the section 7 reconsultation duty. We begin our analysis, as we must, with the language of the statute. *See Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980).

### a. Statutory Language

Section 602(a) of the Arizona–Idaho Conservation Act reads as follows:

Subject to the terms and conditions of Reasonable and Prudent Alternative Three of the Biological Opinion, the requirements of section 7 of the Endangered Species Act shall be deemed satis-

fied as to the issuance of a Special Use Authorization for the first three telescopes and the Secretary shall immediately approve the construction of the following items:

(1) three telescopes to be located on Emerald Peak;

(2) necessary support facilities; and

(3) an access road to the Site.

Three possible constructions exist. First, Sierra Club argues that the language "as to the issuance of a Special Use Authorization" demonstrates that Congress deemed section 7 satisfied for purposes of issuing the special use authorization only. That argument makes no sense either practically or as a matter of linguistics. If Sierra Club were correct, then the project would be subject to the reinitiation of consultation on the day following the issuance of the special use authorization, even before the Secretary could "immediately approve" construction. The interpretation conflicts directly with the statutory requirement that the Secretary authorize immediate construction. Accordingly, we reject Sierra Club's reading of section 602(a).

There is a more reasonable variation of Sierra Club's argument which, although not raised by Sierra Club, should be considered. Section 602(a) could be read to deem section 7 satisfied as to *both* the issuance of the special use authorization *and* the Secretary's immediate approval of construction; however, if following the issuance of the Secretary's approval circumstances exist that warrant the reinitiation of consultation, then section 602(a) would not bar such action. Under this interpretation, section 602(a) would serve to expedite

---

**25.** Those circumstances include a decline in the population of the red squirrel; the designation, following the issuance of the Biological Opinion, of the red squirrel's critical habitat; and the requirement in the Arizona–Idaho Conservation Act that closure of the summer homes and Bible Camp currently located on Mount Graham be delayed, which alters the terms of Reasonable and Prudent Alternative Three of the Biological Opinion. Sierra Club bolsters its argument by pointing to the Biological Update that the Fish and Wildlife Service released in August 1990. That Biological Update, without purporting to analyze the effect of the Arizona–Idaho Conser-

vation Act, states the opinion of the Fish and Wildlife Service that reinitiation of formal consultation is required pursuant to section 7 of the Endangered Species Act. The Biological Update was issued following the district court's grant of summary judgment, and therefore was not a part of the administrative record before the district court at the time that it ruled. Whether or not we may consider the Biological Update on appeal, the result in this case is the same. Our disposition does not require us to determine whether Sierra Club has established the factual predicate for reinitiation of consultation under otherwise applicable law.

the first phase's pre-construction process by ensuring the issuance of both the special use authorization and the Secretary's approval, but would not prevent application of the regular environmental procedures during the remainder of that phase.

The final possible construction is that of the defendants: they argue that section 602(a) deems section 7 of the Endangered Species Act satisfied as to the entire first phase of the project. Under this interpretation, Congress intended that the first three telescopes be built and that section 7 be deemed complied with in order to achieve that goal. Factual circumstances that would otherwise trigger the reinitiation of consultation would not do so with respect to construction of the first three telescopes; the issue whether the first phase of construction may proceed has, in that view, already been resolved.

The basic question to be answered in interpreting section 602(a) is the following: Did Congress intend to waive the requirements of section 7 until after the construction of the first three telescopes was completed, or did it intend only to hasten the project through the stage of the Secretary's authorization but leave the actual construction process subject to further environmental consultation? The language of section 602(a) does not answer the question clearly. The reference to "the issuance of a special use authorization" renders the scope of the section 7 waiver ambiguous. In order to interpret section 602(a), we must examine the structure and history of the statute as well as its purpose. *See Martin v. Occupational Safety & Health Review Comm'n,* —— U.S. ——, 111 S.Ct. 1171, 1176, 113 L.Ed.2d 117 (1991); *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 51, 107 S.Ct. 1549, 1554, 95 L.Ed.2d 39 (1987) ("[i]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy") (quoting, *inter alia, Kelly v. Robinson,* 479 U.S. 36, 43, 107 S.Ct. 353, 357, 93 L.Ed.2d 216 (1986)).

### b. Statutory Structure

Immediately apparent is the different treatment that Congress accorded to the first and second phases of construction. The statute establishes a Mount Graham International Observatory Site to consist of *seven* telescopes, all on Emerald Peak. Arizona–Idaho Conservation Act, sec. 601(a). The first phase of construction involves the first three telescopes, and the second phase involves the next four. Although Congress explicitly recognized that the second phase must proceed in a manner consistent with all applicable environmental laws, it adopted special waiver provisions in the case of the first phase. While section 603(a) expressly applies the requirements of the Endangered Species Act, in full, to the construction of the second four telescopes, section 602(a) provides for at least a partial waiver of section 7 requirements with respect to the first three. Similarly, while section 607 expressly applies the requirements of section 102(2)(C) of the National Environmental Policy Act, in full, to the second phase of construction, it deems those requirements satisfied as to the first phase of construction. Moreover, approval for the second phase is expressly conditioned on a consideration of "all biological data obtained from monitoring the impact of construction of the first three telescopes upon the Mount Graham red squirrel." Arizona–Idaho Conservation Act, sec. 603(b). The defendants argue, with some force, that the distinctions between the two phases suggest that Congress reached a compromise in which the first three telescopes would be constructed immediately but the next four would be constructed in strict compliance with all otherwise applicable environmental laws.

Sierra Club counters that the broad waiver language of section 607 (involving National Environmental Policy Act requirements), compared with the ambiguous language of section 602(a) (the provision before us) demonstrates that Congress intended a lesser waiver in the latter section than in the former. The argument that Congress knew how to use unambiguous waiver language when it intended a complete waiver, and that it failed to use that

language when it waived the provisions of section 7 as to the first phase of the project, is a meritorious one. Nevertheless, it does not, in itself, serve to override the defendants' contrary arguments. The difference in statutory language is simply a factor we weigh in the balance.

Sierra Club also argues that section 601 contemplates the issuance of more than one future Biological Opinion, and that Congress therefore must have foreseen that there might be future Biological Opinions for the first as well as the second phase of construction. This argument has no merit. The plural reference in section 601 can be explained solely by the fact that there will be a second phase of construction. That phase alone may have more than one Biological Opinion. The plural reference does not in any way suggest that additional Biological Opinions may be needed for the first phase.

On balance, a reading of the statute as a whole suggests that Congress intended that the first three telescopes be built immediately, without being subject to the possibility of delay inherent in any reinitiation of consultation. The significantly differing treatment accorded the two phases of construction, while not dispositive, points in that direction. However, the statute does not contain a policy statement telling us expressly that regardless of what might subsequently be determined to be the environmental consequences, Congress was committed to having the first three telescopes built without additional safeguards; and the ambiguity of the statute plus Congress's failure to employ broad waiver language similar to that used in section 607 gives us considerable pause. Accordingly, we are required to proceed further in our effort to ascertain Congress's intent. We next proceed to examine the legislative history. *See Green v. Bock Laundry Mach. Co.,* 490 U.S. 504, 511, 109 S.Ct. 1981, 1985, 104 L.Ed.2d 557 (1989).

### c. Legislative History

It is naive, or disingenuous, to suggest that courts should not consider legislative history when attempting to determine the meaning of statutes. It is true that in some instances statutes are clear on their face and that no further interpretive assistance is required. In those cases it is proper to look only to the statute's plain language. In other instances, however, the language of the statute is uncertain or ambiguous, and legislative statements, particularly committee reports, can be extremely helpful in understanding what Congress intended—in determining what the statute means.

Admittedly, on some occasions when the statutory language is ambiguous, legislative history will not tell us much. When it doesn't, we should acknowledge that fact, and utilize whatever other techniques of statutory construction would be most useful. The extent to which legislative history is helpful to our effort to determine a statute's meaning can best be determined on a case by case basis. Statutory construction is an area in which absolutist rules do not lead to sensible or accurate results. The many and varied canons of statutory construction amply demonstrate this point. Common sense not dogma is what is needed in order to explore the actual meaning of legislative enactments.

Whatever the imperfections inherent in the use of legislative history, there is no justification for trashing the concept itself. Ignoring the relevant legislative history in all cases would unquestionably serve to denigrate the role of Congress. We would be doing a disservice to our system of checks and balances were we to abandon so useful and well-established an interpretive device simply because we have become disenchanted with Congress' performance or because we disagree with the political philosophy that motivates the majority of its members.

In the present case, the legislative history regarding the Arizona–Idaho Conservation Act is exceedingly sparse; it is nonetheless critical to the outcome. The legislation was passed quickly; no committee hearings were held. The bill originated in the Senate where it was sponsored by both Arizona Senators. One week after the bill's passage in the Senate, it was adopted

by the House with hardly any discussion. In total, the *Congressional Record* reports the statements of only three Senators and three Representatives.[26] Both Arizona Senators commented on the bill during Senate deliberations, and two of the five Arizona Representatives did so during consideration in the House. Because this was special legislation relating to a special project in a particular state, because there were no committee reports and instead the legislators from the affected state explained the project and its impact on the floor, and because no legislator spoke in opposition to the bill, we give greater weight than we otherwise might to the statements of the individual legislators who spoke on behalf of the legislation.

The statements made on the floor of the Senate and House consistently support the defendants' interpretation of the Arizona–Idaho Conservation Act. For instance, Senator McCain of Arizona, one of the sponsors and a Republican, first emphasized the fact that the German participants in the international consortium had threatened to withdraw if construction of the observatory was not approved quickly. 134 Cong.Rec. § 15,740 (daily ed. Oct. 13, 1988). He then specifically discussed the question of the immediacy of construction and the role of consultation, stating:

> Three telescopes will be built immediately. They can no longer be stalled by process, by litigation, or by whim. Four telescopes can be built in the future after a timely conclusion to the [Environmental Impact Statement] and consultation between Fish and Wildlife, Forest Service, and the University of Arizona.

*Id.* at 15,741.

Senator DeConcini, the other Senator from Arizona, also a sponsor but a Democrat, explained the differences between the two phases of construction in similar fashion. Like Senator McCain, he stated that the first group of telescopes would be constructed immediately and that consultation would occur with respect to the second group. He said:

> This legislation injects certainty. It makes clear to the public, the courts, and agencies of government that three telescopes will be built on Mount Graham immediately and the remaining four telescopes will be built after consultation between the parties on the viability of the red squirrel.

*Id.* at 15,740.

Similar views regarding the immediacy of construction of the first three telescopes were echoed in the House. Representative Jones of North Carolina observed to his colleagues:

> Although the Mount Graham observation project envisions the possibility of seven telescopes ultimately being built on the site, S. 2840 now clearly recognizes that the decisions regarding the construction of these telescopes will occur in two completely distinct and separate phases. *Arguments have been made that time is of the essence for gaining the necessary clearances for the first phase of the project involving the construction of three telescopes. We are prepared to accept the validity of these arguments for the first three telescopes but are not convinced that a similar claim can be made for the remaining four telescopes.*
>
> The provisions of S. 2840 reflect this division with regard to compliance with the Endangered Species Act and the National Environmental Policy Act. Thus, while *construction of the first three telescopes may proceed as soon as an acceptable management plan has been developed*, no final administration can [or] will be made with regard to authorizing the four remaining telescopes until the requirements of the Endangered Species Act and the National Environmental Policy Act [NEPA] have been fully complied with....

134 Cong.Rec. H10,553 (daily ed. Oct. 20, 1988) (emphasis added).

---

**26.** Senators Burdick (D–ND), DeConcini (D–AZ), and McCain (R–AZ); Representatives Udall (D–AZ), Rhodes (R–AZ), and Jones (D–NC).

Representative Udall of Arizona noted the necessity of short-circuiting the customary environmental procedures with respect to the first three telescopes, although he referred specifically to the National Environmental Policy Act waiver rather than to the one involving the Endangered Species Act. He said:

> The proposal that has come to us from the Senate troubles me. To short circuit the process Congress has established by law to separate out the good projects from the bad projects and to make all the projects better ones, is something I do not regard warmly. And that is what this amendment does, by confirming the unfinished environmental impact statement as meeting the requirements of the National Environmental Policy Act insofar as the first three telescopes are [concerned].
>
> Looking down the road, however, I think that we would be arriving at this point sooner or later anyway and the University of Arizona's argument that an overly protracted administrative process would be tantamount to a decision against putting telescopes on the mountain does have merit.
>
> And in the final analysis, Mr. Speaker, I feel that we really have little choice but to accept this provision. I believe that if this package is sent back to the Senate with any real substantive disagreements that it will be a very great risk indeed. There is too much in this legislation that represents too much work on matters of too great importance to many Arizonans to put in such jeopardy.

*Id.* at H10,546.[27]

Sierra Club concedes that the floor statements indicate a different congressional intent regarding the two phases of construction. Nevertheless, it argues that the legislative history shows a congressional belief that the statute would leave the requirements of the Endangered Species Act intact as to *both* phases. In support of its view, Sierra Club cites, out of context, one portion of Representative Jones's statement:

> Quite frankly, earlier drafts of this measure could have been misinterpreted as waiving parts of the Endangered Species Act as applied to the Mt. Graham observatory project. Since this was not the true intent of the drafters of S. 2840, additional discussions with the staff of the Merchant Marine and Fisheries Committee resulted in considerable alteration of the Mt. Graham language.
>
> These changes were essential for receiving my support of this legislation.

*Id.* at H10,553. When both parts of Representative Jones's statement are read together, however, it is clear that his comments do not support the proposition urged by Sierra Club. Instead, Representative Jones's views, like those of his Senate colleagues, show that those speaking on behalf of the bill believed that it represented a practical compromise: the legislation did not waive the provisions of section 7 of the Endangered Species Act with respect to the Mount Graham *project*—the *entire* seven telescope venture. Rather, it provided that the first phase of construction (the first three telescopes) should proceed immediately, but that the second phase (the remaining four telescopes) would remain subject to all the normal requirements of the Endangered Species Act. Viewed in this light, Representative Jones's statements fully support the defendants' position.

Sierra Club next urges us to consider an exchange between Senators Burdick and DeConcini:

> MR. BURDICK....
>
> First, am I correct that this legislation requires the project in question to comply fully with the requirements of the Endangered Species Act, including the terms and conditions of Reasonable and Prudent Alternative Three in the U.S. Fish and Wildlife Service's Biological Opinion, date July 14, 1988?
>
> MR. DeCONCINI. My colleague from North Dakota is correct—the amendment

---

27. Representative Rhodes of Arizona also commented on the House floor regarding the Arizona–Idaho Conservation Act, but did not address Title VI, which established the Mount Graham International Observatory, in any detail. *See id.* at H10,546–47.

requires compliance with the terms and conditions of the biological opinion throughout the legislation.

134 Cong.Rec. S15,739 (daily ed. Oct. 13, 1988). That exchange also supports rather than contradicts the defendants' position. What Senator DeConcini said in answer to Senator Burdick's question was quite clearly that the terms and conditions of Reasonable and Prudent Alternative Three would fully apply. He did *not* say that the requirements of the Endangered Species Act would apply to both phases of construction, and, in fact, remained silent on that subject notwithstanding his colleague's direct question.

Viewed as a whole, the legislative history of the Arizona–Idaho Conservation Act, even more than the statutory structure itself, supports the defendants' view that the requirements of section 7 of the Endangered Species Act are deemed satisfied as to the entire first phase of construction. The legislative history is clear, and it provides our best insight into the purpose of the statute. Congress was asked to enter the battle and render a decision regarding the future of the Mount Graham Observatory at a time when it had become apparent to all concerned that further delay might cause the international coalition behind the project to dissolve. The dilemma that Congress faced did not stem simply from a scientific dispute over the location or number of telescopes, but from a dispute over whether, in view of the endangered species issue, the project should be built at all. Congress was fully aware that delay caused by the need to comply with environmental procedures might threaten the project's very survival. The legislative history clearly tells us that given the choice between proceeding immediately with the project or taking the risk that it might be lost, Congress opted for immediate construction of the first three telescopes.

d. Post–Enactment Legislative Comments

The best argument that Sierra Club advances to overcome the conclusion suggested by the contemporaneous legislative history consists of the post-enactment statements of individual legislators. The is-

suance of the Biological Update by the Fish and Wildlife Service after passage of the Arizona–Idaho Conservation Act prompted all five Representatives from Arizona and one of Arizona's two Senators to say publicly that they interpreted the Act to permit the reinitiation of consultation regarding the first phase of construction. A joint press release by Representatives Jim Kolbe, Jay Rhodes, Jon Kyl, and Bob Stump, and Senator John McCain, stated:

> We have always believed that the Arizona–Idaho Conservation Act contemplated the possibility of reinitiation of consultation where new information has been found. Each step in the regulatory process has been followed during the life of this project. We have supported this process and appropriately deferred to the best scientific judgment of the scientists and other agency experts involved.
>
> The U.S. Fish and Wildlife Service biological update suggesting reconsultation will be no exception. The judgment of these experts in 1988 was that the Project could proceed without having a significant effect on the continued existence of the red squirrel. We relied upon their opinion then and supported the project; and, accordingly, will defer to it now.

News Advisory, Congress of the United States, House of Representatives (Aug. 6, 1990) (emphasis added). Similarly, Representative Udall stated in a press release issued that same day:

> [T]he supporters of the Endangered Species Act (ESA) never would have cleared the Arizona–Idaho Conservation Act for passage if we believed that it undermined the integrity of ESA or precluded reinitiation of consultation under the set of circumstances contained in today's Fish and Wildlife Service report.

Press Release, Rep. Morris K. Udall (Aug. 6, 1990).

 These statements, while seemingly relevant, cannot, unfortunately, serve as reliable indicators of congressional intent. *See Blanchette v. Connecticut Gen. Ins.*

*Corps.*, 419 U.S. 102, 132, 95 S.Ct. 335, 352, 42 L.Ed.2d 320 (1974) ("[P]ost-passage remarks of legislators, however explicit, cannot serve to change the legislative intent of Congress expressed before the Act's passage. Such statements 'represent only the personal views of these legislators, since the statements were [made] after passage of the Act.'" (quoting *National Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 639 n. 34, 87 S.Ct. 1250, 1265 n. 34, 18 L.Ed.2d 357 (1967)) (citation omitted)). Not only were the statements made two years after the passage of the Arizona–Idaho Conservation Act, but they also represent an apparent change of position for at least one of the speakers. *Compare* News Advisory, Congress of the United States, House of Representatives (Aug. 6, 1990) (Senator McCain stating, "We have always believed that the Arizona–Idaho Conservation Act contemplated the possibility of reinitiation of consultation where new information has been found.") *with* 134 Cong.Rec. S15,741 (daily ed. Oct. 13, 1988) (Senator McCain stating, "Three telescopes will be built immediately. They can no longer be stalled by process, by litigation, or by whim."). As the Supreme Court has said, "We are normally hesitant to attach much weight to comments made after the passage of legislation. In view of the contradictory nature of these cited statements, we give them no weight at all." *County of Washington v. Gunther*, 452 U.S. 161, 176 n. 16, 101 S.Ct. 2242, 2251 n. 16, 68 L.Ed.2d 751 (1981) (citation omitted); *see also Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 118 n. 13, 100 S.Ct. 2051, 2061 n. 13, 64 L.Ed.2d 766 (1980); *United States v. Clark*, 445 U.S. 23, 33 n. 9, 100 S.Ct. 895, 902 n. 9, 63 L.Ed.2d 171 (1980); *Brock v. Writers Guild of America, West, Inc.*, 762 F.2d 1349, 1356 (9th Cir.1985); *American Constitutional Party v. Munro*, 650 F.2d 184, 188 (9th Cir.1981). That must be the case here, as well.

#### e. Agency Interpretation

█ Both parties urge us to consider the interpretation given to the Arizona–Idaho Conservation Act by its administering agency, although they disagree whether the administering agency is the Forest Service or the Fish and Wildlife Service. We agree with the defendants that the administering agency is the Forest Service, which Congress specifically charged with the administration of the statute. *See, e.g.,* Arizona–Idaho Conservation Act, sec. 605(b)–(d). Nevertheless, we do not find that in this case the Forest Service's views are entitled to any weight. Prior to the initiation of the present litigation, the Forest Service indicated its belief that the Arizona–Idaho Conservation Act permitted the reinitiation of consultation regarding the first phase of construction. Subsequent to the filing of this lawsuit, the agency's position changed. Given this fluctuation over the course of two years, we decline to rely on the Forest Service's "expertise." *See Wilshire Westwood Assocs. v. Atlantic Richfield Corp.*, 881 F.2d 801, 809 (9th Cir.1989) (courts should consider "the thoroughness of the agency's consideration, the validity of its reasoning, and the consistency of its position over time").

#### f. All Things Considered

Our analysis of the language, structure, policy, and history of the Arizona–Idaho Conservation Act leads us to conclude that, despite its inartful wording, that statute deems the requirements of section 7 of the Endangered Species Act satisfied as to the entire first phase of construction of the astrophysical complex.[28] Viewed as a whole, the statute clearly differentiates between its treatment of the first three telescopes and the next four telescopes. Construction of the first three is plainly exempted from other important environmental requirements, specifically the National Environmental Policy Act. Although the statute does not waive the provisions of section 7 of the Endangered Species Act

---

**28.** We reach our conclusion after considering and rejecting Sierra Club's additional argument that the statute incorporates a provision in the

Biological Opinion regarding the reinitiation of consultation. *See infra* Part III.C.

for the entire first phase of the project as clearly as it waives the provisions of NEPA, the legislators who spoke on the floor of the Senate and House in support of the legislation made no distinction between the two waivers and uniformly represented to their colleagues prior to the vote not just that the special authorization would be issued or that the Secretary's approval would be granted, but that construction would occur immediately. Because anything short of such a provision would not have provided the necessary assurance that further environmental delay would not bring the project to a halt, the conclusion that Congress intended to waive the section 7 provisions regarding the first three telescopes fully seems more consistent with the statutory objectives than the alternatives suggested by the opponents of the project. The fact that Congress made authorization of the final four telescopes contingent on an evaluation of the impact on the red squirrel of construction of the first three telescopes also indicates that the legislators sought to achieve a workable and practical compromise between the needs of the scientific community on the one hand and the legitimate concerns of the environmentalists on the other.

Our conclusion is strengthened by the fact that were we to interpret the Arizona–Idaho Conservation Act otherwise, and hold that the section 7 waiver applied only through the Secretary's authorization phase but not afterwards, the result would be to give the statute little practical significance. Congress knew at the time of passage that, under the Fish and Wildlife Service regulations,[29] the factual basis for reconsultation would come into existence almost immediately after the Secretary is-

sued an authorization for construction of the first three telescopes. As one example of that fact, section 4 of the Endangered Species Act requires the Fish and Wildlife Service to designate critical habitat of an endangered species no later than two years after the publication of a notice proposing to list the species as endangered. 16 U.S.C. §§ 1533(b)(6)(A)(ii), (b)(6)(C) (1988). At the time the Arizona–Idaho Conservation Act was passed, the notice proposing to list the red squirrel as endangered had already been issued, as had the Fish and Wildlife Service's proposed boundaries for the red squirrel's critical habitat (in an area including Emerald Peak), but critical habitat had not yet been formally designated. Thus, Congress should have been aware that designation of the area involved was imminent. In this connection, Congress also knew that the Fish and Wildlife Service regulations require the reinitiation of formal consultation whenever critical habitat is designated subsequent to the issuance of a Biological Opinion. 50 C.F.R. § 402.16(d). Because the Biological Opinion had already been issued, Congress should have anticipated that as soon as the Fish and Wildlife Service made its formal designation of critical habitat, the regulations would *require* the reinitiation of formal consultation. Were the statute to be construed as incorporating the section 7 reconsultation requirement, then Congress would have done very little to overcome the basic problem that it had been asked to solve—that is, to ensure that the environmental obstacles to constructing an astrophysical complex on Mount Graham could be surmounted in a timely manner, without the type of delay that might scuttle the entire project.[30]

**29.** Quoted *supra* at pages 1450–1451.

**30.** The same reasoning applies to the other two factual circumstances which Sierra Club claims trigger the need for reinitiation of consultation. First, Sierra Club argues that congressional modifications to Reasonable and Prudent Alternative Three of the Biological Opinion (i.e., delayed closure of the Bible Camp and summer homes on Mount Graham) trigger the need for reinitiation of consultation pursuant to 50 C.F.R. § 402.16(c). Assuming that Sierra Club is correct, then the modifications that Congress

enacted would serve by themselves to postpone construction pending the issuance of a new Biological Opinion. In light of its expressed intention to authorize immediate construction, we cannot conceive that Congress would have enacted the modifications knowing that its very action would necessarily cause further delay.

Finally, Sierra Club urges that a recent drop in the population of red squirrels constitutes "new information" triggering the need for reinitiation of consultation pursuant to 50 C.F.R. § 402.16(b). The potential for a dramatic drop

Before reaching a final conclusion, there is one further possibility we should explore. It could be argued that Congress took a practical approach to the issue of waiver—that it intended to waive the reconsultation requirements as to matters that it was aware of at the time of enactment, but that it did not intend to foreclose consideration of new or unanticipated developments. Under this theory, the designation of critical habitat would not trigger the need to reinitiate consultation because Congress was aware when it passed the Arizona–Idaho Conservation Act that critical habitat designation was imminent. Similarly, neither the congressional modifications to Reasonable and Prudent Alternative Three nor even, possibly, the drop in the population of red squirrels would trigger the need for reconsultation, because Congress knew of the existence of the first at the time it enacted the statute and certainly was aware of the possibility of the second. However, completely new or unanticipated developments, such as the occurrence of a major forest fire on Emerald Peak, might require the halting of construction pending reconsultation and the issuance of a new Biological Opinion. The problem with this approach is that nothing in the language of section 602 (or in the legislative history) suggests that Congress intended to provide for reconsultation in the case of some of the circumstances set forth in the Fish and Wildlife Service regulations but not in the case of others, nor that Congress intended to carve out exceptions to the immediate construction requirement in the case of emergencies or unanticipated developments. Congress could, of course, have made either of these choices. But the statutory language shows plainly that it followed a different course,[31] one we are not free to change. There is no ambiguity on this point. Moreover, even were it possible for us to rewrite the statute, it would be extremely difficult to determine what Congress knew at the time of enactment and what constituted a new, unforeseen, or unanticipated development. Environmental issues of this type are rarely black or white, usually complex, frequently difficult to delineate, and often troubling to resolve. The law is confusing enough in this area without our creating additional and unnecessary complications. Reading a "new or unanticipated" exception into the statute would undoubtedly lead to more protracted litigation and the strong possibility of further procedural delays. Accordingly, we decline to interpret the Arizona–Idaho Conservation Act in a way that creates a new ambiguity when a clearer, more precise interpretation exists which is, at the very least, as consistent with the purposes and

in population under existing biological conditions was hardly an unforeseen circumstance—it was precisely because Congress anticipated that a drop might occur, due to existing circumstances or circumstances caused by construction, that it compromised by authorizing immediate construction of the first three telescopes but delaying construction of the next four. The compromise would be rendered of little significance if we were to interpret the statute as permitting the reinitiation of consultation as to the first three telescopes on the basis of a drop in the red squirrel population.

31. The only instance in which the Arizona–Idaho Conservation Act specifically addresses the subject of reinitiation of consultation relates to the exceeding of incidental take. The Arizona–Idaho Conservation Act expressly states that the construction of the first three telescopes shall be subject to the terms and conditions of Reasonable and Prudent Alternative Three of the Biological Opinion. One of the terms and conditions of Reasonable and Prudent Alternative Three is that the Fish and Wildlife Service and the Forest Service shall reinitiate formal consultation when more than six red squirrels are subjected to "incidental take." Statements on the floor of the Senate and House expressly referred to that term and condition of Reasonable and Prudent Alternative Three. We recognize that the existence of this provision cuts against the argument that Congress sought to ensure definitively that regardless of the circumstances construction would not be further delayed because of concerns over the survivability of the red squirrel. Delay could indeed occur in this one specific instance. On the other hand, with respect to the specific point we are addressing here, the existence of an express exception suggests that other exceptions are not contemplated by the statute. Thus, the existence of the limited exception adds some strength to the argument against reading the statute as requiring reconsultation in the case of new or unanticipated occurrences. All in all, however, we cannot give much weight, one way or the other, to the inclusion of the incidental take provision in the Act.

objectives underlying the Act. *See Commissioner v. Brown*, 380 U.S. 563, 571, 85 S.Ct. 1162, 1166, 14 L.Ed.2d 75 (1965).

Our conclusion that the Arizona–Idaho Conservation Act deems the requirements of section 7 of the Endangered Species Act satisfied with respect to construction of the first three telescopes renders irrelevant Sierra Club's assertions that a factual basis now exists to invoke reconsultation pursuant to section 7. The district court properly granted summary judgment on Sierra Club's section 7 reconsultation claims, and we affirm that part of its decision.

### 2. *National Forest Management Act Claim*

▮ The district court also granted summary judgment to the defendants on Sierra Club's claim that the Forest Service violated the National Forest Management Act and its implementing regulations by failing to maintain a minimum viable population of red squirrels. The National Forest Management Act requires the Forest Service to promulgate regulations for the development and revision of land management plans that will "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives...." 16 U.S.C. § 1604(g)(3)(B). The regulation promulgated pursuant to that mandate states:

Fish and Wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area. For planning purposes, a viable population shall be regarded as one which has the estimated numbers and distribution of reproductive individuals to insure its continued existence is well distributed in the planning area. In order to insure that viable populations will be maintained, habitat must be provided to support, at least, a minimum number of reproductive individuals and that habitat must be well distributed so that those

individuals can interact with others in the planning area.

36 C.F.R. § 219.19.

According to Sierra Club, the fact that a viable population of red squirrels no longer exists is proof that the Forest Service violated the National Forest Management Act and its implementing regulations. The defendants respond that the Forest Service is not required to maintain a minimum viable population of an endangered species, which is by definition no longer viable. We need not decide which party is correct. The Arizona–Idaho Conservation Act precludes us from granting the relief Sierra Club seeks on the National Forest Management Act claim.

We have already decided that Congress, having considered the endangered status of the red squirrel, opted for immediate construction of the first three telescopes. *See supra* Part III.B.1. Clearly, the fact that there might no longer be a viable population of red squirrels was part of what Congress considered in balancing the competing interests. Sierra Club's claim that the red squirrel population is no longer viable therefore is not a basis for us to halt construction of the first three telescopes.[32] Accordingly, the district court properly granted summary judgment to the defendants on the National Forest Management Act claim.

### 3. *Critical Habitat Claim*

▮ The district court granted summary judgment to the defendants on Sierra Club's claim that the Fish and Wildlife Service violated section 4 of the Endangered Species Act by failing to designate critical habitat in a timely manner. Section 4 requires that critical habitat be designated generally within one year, but in no event longer than two years, after the publication of a notice proposing to list a species as endangered. *See* 16 U.S.C. § 1533(b)(6)(A)(ii), (b)(6)(C). The Fish and Wildlife Service published a notice proposing to list the red squirrel as endangered

---

**32.** We note that the October 1989 census gives rise to a question whether Sierra Club's claim of a non-viable population has been rendered moot. *See supra* note 1. However, given our disposition of the National Forest Management Act issue, we need not consider mootness.

on May 21, 1986. *See* 51 Fed.Reg. 18,630 (1986). By the time that this lawsuit was filed on July 26, 1989, the Fish and Wildlife Service had still not made a final designation of critical habitat. That designation was ultimately made on January 5, 1990. *See* 55 Fed.Reg. 425 (1990).[33]

Sierra Club initially sought a judicial order for the Fish and Wildlife Service to declare critical habitat for the red squirrel. Because critical habitat has been declared, the requested relief is moot. Sierra Club now argues that if the critical habitat had been declared in a timely manner, the Fish and Wildlife Service could not legally have issued a Biological Opinion including Reasonable and Prudent Alternative Three. *See* 50 C.F.R. § 402.02 (prohibiting the issuance of a reasonable and prudent alternative authorizing the "destruction or adverse modification" of critical habitat). That argument is also moot. While it is essential that the Fish and Wildlife Service, like all other government agencies, comply with the law, no purpose would now be served by declaring the Biological Opinion invalid. Regardless of the legality of the Biological Opinion, Congress adopted it and enacted it into law. Whether Congress was acting under a misapprehension of fact or law is irrelevant once legislation has been enacted. *See Moor v. County of Alameda*, 411 U.S. 693, 709, 93 S.Ct. 1785, 1795, 36 L.Ed.2d 596 (1973). In any event, the relief Sierra Club now seeks is the reinitiation of consultation. We have already held that the first phase of construction is immune from reconsultation requirements. *See supra* Part III.B.1. Accordingly, we affirm the grant of summary judgment on Sierra Club's critical habitat claim.

## C. The "Jurisdictional Appeal"

The parties agree that the district court denied Sierra Club's motion to enjoin construction pursuant to claims 5 and 9 because it believed that the pendency of the "Summary Judgment Appeal" deprived it of jurisdiction over that motion. They have now appealed that decision to us. The parties agree that a ruling by us on the question whether the district judge had the authority to rule on the motion would not advance this litigation, and they urge us to reach the merits of the motion. Because all parties have briefed the merits, we grant that request.

### 1. *Reconsultation Allegations*

The reconsultation segment of the "Jurisdictional Appeal" is closely related to the reconsultation section of the "Summary Judgment Appeal," *supra* Part III.B.1. According to Sierra Club, Reasonable and Prudent Alternative Three of the Biological Opinion, as incorporated into the Arizona–Idaho Conservation Act, includes a provision relating to reconsultation. We disagree. It is Sierra Club's position that a paragraph governing reconsultation contained in the conclusion of the Biological Opinion is a part of Reasonable and Prudent Alternative Three. The paragraph is textually distinct from that Alternative and cannot reasonably be considered to be a part of it. When Congress adopted Reasonable and Prudent Alternative Three, it did not adopt general introductory or conclusory remarks set forth in the remainder of the Biological Opinion.

### 2. *Other Allegations*

■ Sierra Club also seeks to enjoin construction on the basis of alleged road closure violations and monitoring program violations. We have previously issued an order of limited remand concerning the monitoring allegations. *See Mount Graham Red Squirrel v. Yeutter*, 930 F.2d 703 (9th Cir.1991). At oral argument, Sierra Club conceded that the road closure allegations would not support the issuance of a preliminary injunction barring construction of the astrophysical complex. Instead, Sierra Club admitted, the road closure violations could only be remedied through an

---

**33.** The boundaries of the critical habitat that was formally designated on January 5, 1990, are identical to those of the red squirrel "refugium" which the Forest Service had earlier designated in the Biological Opinion. The Forest Service had relied on the Fish and Wildlife Service's proposed critical habitat.

order closing any roads that illegally remain open. However it did not ask the district court for such an order at the time of the hearing on the preliminary injunction. Therefore we cannot consider that relief now. Moreover, the district court did not consider the merits of the claim for preliminary relief resulting from the alleged road closure violations, citing jurisdictional grounds. Correct or incorrect, it is certainly free to reach the merits of that claim now. We remand this part of the "Jurisdictional Appeal" for that purpose.

### D. The "Intervention Appeal"

Mountain States argues that intervention is necessary in order to protect the economic, recreational, and tourism interests of persons who would be affected by road and trail closures on Mount Graham. Its appeal from the denial of intervention was filed more than sixty days after the denial of its motion to intervene, but within sixty days of the denial of its untimely motion for reconsideration.[34] Thus, the threshold issue is whether Mountain States' untimely motion for reconsideration tolled the sixty day time period in which it was required to appeal from the original order denying the motion to intervene. The answer to that question determines whether we have jurisdiction over the appeal from both orders, or only over the appeal from the denial of the motion for reconsideration.

 A motion for reconsideration tolls the time in which a party must lodge an appeal if the filing of the motion is timely, but ordinarily does not do so otherwise. *See Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 203, 108 S.Ct. 1717, 1722, 100 L.Ed.2d 178 (1988) (the time limits of Fed.R.App.P. 4 are "mandatory and jurisdictional"); *Fiester v. Turner*, 783 F.2d 1474, 1475 (9th Cir.1986); *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1419 (9th Cir.1984). Under the "unique circumstances" doctrine, an appellate court may hear a late-filed appeal if the delay was induced by affirmative assurances from the district court that the appeal would be timely. *Slimick v. Silva (In re Slimick)*, 928 F.2d 304, 310 (9th Cir.

1990). However, Mountain States has cited no affirmative representations by the district court that caused it to postpone filing its appeal.

 Mountain States contends that the district court's ruling on the merits of its untimely motion for reconsideration within the sixty day appeal period made it reasonable for Mountain States to assume that the appeal time had been tolled, although the district court made no comment with respect to the timeliness of the motion or of any prospective appeal. In so arguing, Mountain States relies on *Barry v. Bowen*, 825 F.2d 1324, 1329 (9th Cir.1987), and *United Artists Corp. v. La Cage Aux Folles, Inc.*, 771 F.2d 1265, 1267–70 (9th Cir.1985). Subsequent decisions of the Supreme Court and of our court, however, have invalidated the good faith and reasonable reliance standard espoused by these opinions and have limited the unique circumstances test to instances where "a court has affirmatively assured a party that its appeal will be timely." *Slimick*, 928 F.2d at 310; *see also Osterneck v. Ernst & Whinney*, 489 U.S. 169, 179, 109 S.Ct. 987, 993, 103 L.Ed.2d 146 (1989) (unique circumstances exist "only where a party has performed an act which, if properly done, would postpone the deadline for filing his appeal *and has received specific assurance by a judicial officer that this act has been properly done*" (emphasis added)). In *Slimick*, we expressly disapproved as inconsistent with *Osterneck* the holding in *Barry*, 825 F.2d at 1329, that appellant was entitled to rely on the district court's consideration of its untimely motion for clarification of the judgment. 928 F.2d at 310 n. 8. The cases that Mountain States relies on, while once valid, are no longer good law.

 In short, the present rule in this circuit is that "ambiguous or implicitly misleading conduct by courts does not release litigants from their appeal deadlines. If a party believes a court has acted ambiguously as to an appeal deadline, it bears the

---

**34.** A motion for reconsideration must be served "not later than 10 days after entry of the judgment." Fed.R.Civ.P. 59(e). The district court

denied Mountain States' motion to intervene on November 20, 1989, but Mountain States did not move for reconsideration until January 2, 1990.

burden of seeking clarification." *Slimick,* 928 F.2d at 310. Under the current state of the law, the district court's action in ruling on Mountain States' untimely petition did not serve to extend the time provided for an appeal from the denial of the motion to intervene.

While we lack jurisdiction over the merits of the district court's denial of the motion to intervene, we do have jurisdiction over Mountain States' appeal from the denial of its motion for reconsideration because the notice of appeal was filed within sixty days of that judgment. To review the denial of the motion for reconsideration we need consider only new information. There is no allegation of mistake, inadvertence, surprise, or excusable neglect.[35] Here, notwithstanding Mountain States' claims, no new information has been presented. The only new material in the motion to reconsider was a rebuttal to Sierra Club's opposition to the initial motion, and all the information contained in the rebuttal was known to Mountain States at the time of the initial motion. Thus, the district court did not abuse its discretion in denying the motion for reconsideration.

### IV. CONCLUSION

The possible extinction of an endangered species is not a threat that we take lightly. If the Mount Graham Red Squirrel becomes extinct as a result of the astrophysical research project, then the new telescopes will not represent an unqualified step forward in our quest for greater knowledge. As we expand our horizons by building bigger and better telescopes, we would do well to remember that we also have much to learn from the plant and animal life in the world around us. By contributing to the extinction of an endangered species, we limit our horizons at least as seriously as we do by delaying or even disallowing the construction of new telescopes.

In passing the Arizona–Idaho Conservation Act, Congress has balanced the competing interests—albeit through an expedited process that may not have permitted it to consider fully concerns that it otherwise might have addressed. Moreover, the balancing may not have consisted exclusively of weighing one lofty purpose against another, i.e., the advancement of scientific knowledge against species preservation. There is another element that may have been present here as well—the prestige and pride of local institutions and other parochial interests. In that context, the lowly Red Squirrel's chances for a fair hearing may have been considerably reduced. Whether in other circumstances the result would have been the same, and whether if Congress had considered the question more carefully or fully it would have taken a position on reconsultation that was more protective of the squirrel, we cannot say. The resolution it reached is the one that we are bound to enforce. We can only hope that Congress's decision will prove to be a wise one.

AFFIRMED IN PART; REMANDED IN PART; DISMISSED IN PART AS MOOT.

### APPENDIX

TITLE VI—MOUNT GRAHAM INTERNATIONAL OBSERVATORY *

Establishment of the Mount Graham International Observatory Site

Sec. 601. (a) The Secretary of Agriculture (hereinafter in this title referred to as the "Secretary") shall issue a Special Use Authorization, subject to the terms and conditions of Reasonable and Prudent Alternative Three of the United States Fish and Wildlife Service Biological Opinion, dated July 14, 1988 (hereinafter referred to as "the Biological Opinion"), to the State of Arizona Board of Regents on behalf of the

---

**35.** An untimely motion for reconsideration is construed as a motion based on Fed.R.Civ.P. 60(b). *Straw v. Bowen,* 866 F.2d 1167, 1171–72 (9th Cir.1989). Rule 60(b) permits relief from judgment where the movant can demonstrate, *inter alia,* "mistake, inadvertence, surprise, or excusable neglect," or "newly discovered evi-

dence which by due diligence could not have been discovered in time to move for a new trial."

* Arizona–Idaho Conservation Act, Title VI, Mount Graham International Observatory, Pub.L. No. 100–696, 102 Stat. 4597 (1988).

University of Arizona for the establishment of the Mount Graham International Observatory Research Site (hereinafter referred to as the "Site"), which shall, subject to any subsequent biological opinions issued by the United States Fish and Wildlife Service under the Endangered Species Act, and the provisions of this title, include provision for seven telescopes and necessary support facilities, for the purposes of scientific and astronomical research.

(b) The Site referred to in subsection (a) shall include not more than 24 acres within the 150–acre area of the Coronado National Forest, Arizona, as generally depicted on a map entitled, "Mount Graham International Observatory Site," dated July 28, 1988. Copies of the map shall be available for public inspection in the Office of the Chief, Forest Service, United States Department of Agriculture, Washington, District of Columbia, and the Forest Service office located in Tucson, Arizona.

### Construction Authorization

Sec. 602. (a) Subject to the terms and conditions of Reasonable and Prudent Alternative Three of the Biological Opinion, the requirements of section 7 of the Endangered Species Act shall be deemed satisfied as to the issuance of a Special Use Authorization for the first three telescopes and the Secretary shall immediately approve the construction of the following items:

(1) three telescopes to be located on Emerald Peak;

(2) necessary support facilities; and

(3) an access road to the Site.

(b) Until the road described in subsection (a)(3) above is constructed, the Secretary shall allow the University of Arizona to use forest roads FR 507 and FR 669 to the extent permitted in the Biological Opinion.

### Additional Telescope Construction Authorization

Sec. 603. (a) The Secretary shall, subject to the requirements of the Endangered Species Act and other applicable law, authorize the construction of four additional telescopes on Emerald Peak.

(b) Consultation under section 7(a)(2) of the Endangered Species Act with respect to construction of the four additional telescopes referred to in subsection (a) shall consider, among other things, all biological data obtained from monitoring the impact of construction of the first three telescopes upon the Mount Graham red squirrel. Authorization by the Secretary for the construction of four additional telescopes shall be consistent with requirements deemed necessary to avoid jeopardizing the continued existence of any species listed under and pursuant to the Endangered Species Act.

### Management Plan

Sec. 604. (a) The University of Arizona, with the concurrence of the Secretary, shall develop and implement a management plan, consistent with the requirements of the Endangered Species Act and with the terms and conditions of Reasonable and Prudent Alternative Three of the Biological Opinion, for the Site.

(b) Such management plan shall include provisions for the construction, operation and maintenance of the Site, access to the Site, and related support facilities.

(c) The management plan shall be included in any Special Use Authorization issued by the Secretary to the University of Arizona.

### Existing Special Use Authorizations

Sec. 605. (a) Those Special Use Authorizations now in effect for the Columbine Summer Home Tract area and the Arizona Bible School Organization Camp shall continue, subject to the terms and conditions of the authorizations, for the duration of the term specified in each authorization. Prior to the termination, nonrenewal or modification of those Special Use Authorizations for the areas noted above, the Secretary shall, with the assistance of the United States Fish and Wildlife Service, conduct a biological study to determine the effects of such special use authorizations upon the Mount Graham red squirrel and other threatened or endangered species. In making this determination, the Secretary shall consider the small amount of land under

special use authorizations. The biological study shall also involve the participation of representatives from the community of Safford, Arizona, all of the affected parties, and any other appropriate interests. In addition to the biological study, the Secretary shall initiate consultation with the United States Fish and Wildlife Service pursuant to section 7(a)(2) of the Endangered Species Act regarding the termination, non-renewal, extension or modification of the special use authorizations.

(b) Pursuant to title 2300 of the Forest Service Manual, special use terminations, nonrenewals, or modifications shall not take effect until ten years from the last date of the tenure of existing special use authorizations described in subsection (a). Unless the biological study or the biological opinion issued by the United States Fish and Wildlife Service after consultation under the Endangered Species Act concluded that an earlier date was necessary to avoid jeopardizing the continued existence of the Mount Graham red squirrel or any other threatened or endangered species, such actual terminations, nonrenewals, or modifications shall not take effect before completion of a biological study by the United States Fish and Wildlife Service to begin in the year 2000. This additional study shall be subject to the same requirements and involve the same participants as described in subsection (a).

(c) If, after completion of these studies, termination, modification or nonrenewal of special use authorizations described in subsection (a) are prescribed, the United States Forest Service shall, with the cooperation and approval of the holders of these special use authorizations, develop a relocation plan for such individuals and entities.

(d) Nothing in this section is intended to preclude the termination of special use authorizations for breach by the permittee of terms and conditions of the authorizations.

### Financial Responsibilities

Sec. 606. In implementing this title, all costs directly associated with construction and site preparation for telescopes, support facilities, a new access road, the biological monitoring program for the Mount Graham red squirrel as contained in the terms and conditions of Reasonable and Prudent Alternative Three of the Biological Opinion, and the retention of an onsite biologist, shall be funded by the University of Arizona.

### Environmental Impact Statements

Sec. 607. With reference to the construction of the first three telescopes, related facilities, and the access road within the boundaries of the Site described in section 601, the requirements of section 102(2)(c) of the National Environmental Policy Act of 1969 shall be deemed to have been satisfied. The Environmental Impact Statement for the Site, currently in process, shall continue and shall use the information developed to date and any additional appropriate information in analyzing the impacts of the four additional telescopes authorized under section 603 of this title.